Argued January 3; affirmed January 30, 1945

## ROWELL v. TODD ET AL.

(155 P. (2d) 314)

Before BELT, Chief Justice, and KELLY, BAILEY, BRAND and HAY, Associate Justices.

*Glenn R. Jack,* of Oregon City (Butler & Jack, of Oregon City, on the brief), for appellants.

*Barnett H. Goldstein,* of Portland, for respondent.

KELLY, J.

Error is assigned by defendants in the action of the trial court in overruling the motion of defendants for an order of involuntary nonsuit and in overruling defendants' motion for a directed verdict in favor of defendants.

In support of their assignment of error, defendants urge that all the elements involved in a malpractice action, including the element of proximate cause, must be established by competent medical testimony, and contend that there is no substantial evidence, medical or otherwise, in the record before us, that anything the defendants did, or failed to do, caused the plaintiff any damage or was the proximate cause of the resultant damage.

The testimony is conflicting with respect to the treatment accorded to plaintiff by defendants.

There is little conflict as to what the defendants should have done and should not have done, except as to the propriety of directing that plaintiff be taken to a hospital, and as to the advisability of using the X-ray machine.

As stated, it is insisted by counsel for defendants that there is no competent testimony of a substantial nature to the effect that defendants' treatment of plaintiff, or the lack of it, was the proximate cause of the damage sustained by plaintiff. For that reason, we will give an outline of the testimony introduced in behalf of plaintiff.

On the 29th day of August, 1941, while plaintiff, a boy of thirteen years of age, with some companions, was jumping from one tie to another at the railroad tracks in Molalla, Oregon, he fell and fractured both bones of his forearm. The end of the radius penetrated his skin and with the epiphysis protruded into the palm of his hand. Upon being advised of his accident, his mother immediately took him to defendants' office for professional treatment. Defendants gave plaintiff treatment for approximately eight days, and then plaintiff was taken by his mother to Portland, Oregon, and placed under the care of Dr. Otis F. Akin.

Plaintiff, his father and his mother testify to a course of treatment which they claim defendants gave plaintiff. In effect, plaintiff's mother testified that when she and plaintiff came to the building on the upper story of which defendants maintained their office, she went upstairs into defendants' office alone and told Dr. Todd that her boy had broken his arm and asked the doctor to go down and see if he should be taken to the hospital, or if the doctor could take care of it in his office. Upon examining plaintiff, Dr. Todd told plaintiff's mother to bring plaintiff upstairs and assured her that he could take care of plaintiff there. Plaintiff's mother observed dirt at the end of the protruding bone. She further testified that Dr. Todd rinsed his hands in a pan of water and wiped them on a towel and then took a wash pan and got some water in it and Dr. Hume put the boy to sleep. Then Dr. Todd poured something in the wash pan, or the water, that smelled like lysol and turned the water milky looking. He then took a piece of cotton and took his hand and washed the bone off with water. Then Dr. Todd took hold of plaintiff's hand, put his thumbs against the end of the bone and pushed with his thumb against the end of the bone and pulled against plaintiff's hand with the other part of the doctor's hand and forced the bone back in. Plaintiff's mother further testified that Dr. Hume held on to plaintiff's elbow to hold it down while Dr. Todd was pulling at plaintiff's hand and pressing the protruding bone back. Plaintiff's mother further testified that nothing was done inside the wound to clean it before the bone was pushed back. She also testified that Dr. Todd told her that only one bone was broken.

It is conceded that in caring for plaintiff, defendants made no use of their X-ray machine.

Plaintiff's mother further testified that after the protruding bone had been pushed back, Dr. Todd pressed around on plaintiff's arm, then took a piece of gauze and wiped it off and sewed up the open wound. She further testified that no gauze was put in the wound and that Dr. Todd put seven stitches in plaintiff's arm when he sewed up the wound. That no opening was left but the wound was sewed up smooth and fast. Then, according to the testimony of plaintiff's mother, the defendants put a piece of gauze packing over the wound and bound a metal splint on with gauze so it would hold his hand to the splint. The doctors then put plaintiff's arm in a sling which encircled plaintiff's neck and told plaintiff's mother to take. plaintiff home and bring him back the next day.

Before plaintiff and his mother left the defendants' office, plaintiff's father arrived and when plaintiff's father asked Dr. Todd if the doctor thought that plaintiff should be taken to a hospital, Dr. Todd said, no, that wasn't necessary.

Plaintiff's mother also testified that the needle used in sewing up plaintiff's arm was not sterilized and that Dr. Todd gave her no medicine for her son or medicinal preparation or prescription of any kind and gave her no advice as to treatment, except to tell her to keep plaintiff quiet.

It also appears from the testimony of plaintiff's mother that she had acted as a practical nurse and was experienced in taking the temperature of those whom she so attended.

From her testimony, it is disclosed that upon August 30, 1941, she brought the plaintiff back to defendants' office at which time defendant, Dr. Todd, removed the splint and the gauze pack from over the wound, put

a fresh pack upon it and put the arm back in the splint. Dr. Todd told her that plaintiff was getting along fine and asked her to bring plaintiff back next day.

The next day, August 31, according to his mother's testimony, plaintiff's temperature was 102 degrees. Dr. Todd ascribed the rise in temperature to the "reaction from the break". Dr. Todd then put a fresh piece of gauze on the outside of the wound "and tied it back up".

The fourth day after plaintiff's accident, September 1, 1941, according to the testimony of plaintiff's mother, there was some pus around the stitches and plaintiff's temperature was 103 degrees. Dr. Todd is represented by that witness as saying, in answer to her question as to plaintiff's progress, "All right, he is doing just fine".

From her testimony, it appears that on this day, namely, September 1, 1941, plaintiff "was suffering something awful and awful restless and couldn't sleep or rest at all of a night or day either." Because of plaintiff's suffering, his father went to Dr. Todd and, according to the father's testimony, told Dr. Todd that plaintiff didn't rest at night, whereupon, Dr. Todd said: "I will give you some morphine tablets and that will make him rest." The directions were to give plaintiff one to put him to sleep so he could rest, and, if he got restless, to give him another one.

Plaintiff's mother testified that she gave the tablets to plaintiff to relieve the pain. She also testified that plaintiff's arm began swelling on the second day and just kept swelling all up. According to the mother, Dr. Todd said it was natural for the arm to swell by reason of its having been broken.

On the fifth day, [September 2,] defendant removed the dressing and "took his thumb and just mashed on the flesh like this, around where he had it sewed up there, and forced a little pus out of there and cleaned it off". At that time, according to plaintiff's mother, Dr. Todd said it "was natural that it would be pussy". She also testified that then her son's temperature "was around 103".

On the sixth day [September 3,] pursuant to Dr. Todd's direction, plaintiff's mother returned with plaintiff to defendants' office whereupon Dr. Todd took the splint off and took off the piece of gauze that was lying next to and outside of the wound, and merely put a fresh piece of gauze back over the wound and bound it back up.

On the seventh day [September 4,] pursuant to Dr. Todd's direction, the mother took plaintiff down to defendants' office. At that time, according to her testimony, plaintiff's arm was swollen beyond the elbow and his temperature was 104 degrees. Dr. Todd took three stitches out of plaintiff's arm that morning and by using a pair of forceps forced a piece of gauze in where he had removed the stitches. The witness testified that the forceps were not sterilized. In answer to her inquiry, as to whether plaintiff was worse, witness testified that Dr. Todd said: "Oh, he is doing all right". She also testified that she asked the doctor if he thought perhaps she should take plaintiff to the hospital, whereupon the doctor said: "No, I think he is going to be all right. I am going to leave the splint off to-day and I want you to put hot packs on it". Because of that statement, there was no splint put on after the seventh day. This witness also testified that more

tablets were secured by the father of plaintiff . These tablets were termed white morphine tablets by witness.

The mother also testified that on the eighth day [September 5,] plaintiff was extremely nervous, and part of the time he was kind of in a stupor. "He was awful sick, and the eighth day I took him back and they told me to keep putting the hot packs on his arm." This witness also testified that neither of the defendants ever told her to take plaintiff to a hospital or that he should be in a hospital. She also testified that neither of the defendants suggested that she should take her son to Dr. Akin or any other specialist.

On the ninth day [September 6,] according to the mother, plaintiff's arm was swollen to the top of his shoulder and that the arm was blue and his fingers were black. Dr. Todd cleaned the pus off after forcing a tablespoon or two of bloody, yellow, thick pus through the opening of the wound by pressing on the arm with his thumb. Dr. Todd then told the mother to bring plaintiff back the next day. Instead, plaintiff's father went to defendants' office and told Dr. Todd that they were taking plaintiff to Dr. Akin and to the hospital. The father testified that Dr. Todd

> "stood there just for a minute and it seemed like it kind of made him mad or something was wrong, and then he said, 'Well, I guess the hospital would be the best place for him'. * * * 'I will write you a letter to Dr. Akin.' "

Both of his parents and plaintiff testified that no other medicine was prescribed or furnished by defendants except the tablets described by them as morphine tablets.

On September 6th, [the ninth day following the accident] plaintiff's parents took him to Dr. Akin's

office in Portland, and then, at Dr. Akin's direction, to the Good Samaritan Hospital.

Dr. Akin testified that when plaintiff came to his office, plaintiff's temperature was 101.2 degrees and that the appearance of his arm indicated an infection in the forearm, probably both staphylococcic and sterptoccic.

The writer deems Dr. Akin's explanation of the meaning of these terms worthy of record here. He said:

"When one has blood poisoning, he has one or the other of those organisms or germs. They are identified under the microscope after they have been stained, as being in clusters, in which case they are called staphylococcic, which means like a bunch of grapes, and the other type is a strepococcic and that means chainlike. Strep means chain, so those are spotted on the smear on a glass slide in a string and called streptococcic. Both of them are highly dangerous, but strep is more virulent and deadly than the staph, but both of them cause loss of life."

We quote further from Dr. Akin's testimony:

"Q So you would say that that was the type of infection that was manifested and observed?

A Yes.

Q Then you say you took an X-ray. What was the purpose of taking an X-ray?

A To find out if the bones had been fractured, and to find out their position.

Q Could you tell without taking an X-ray at that particular point the nature and extent of the fracture, if any, and the exact position of the bones?

A I could tell something about it, whether it was grossly displaced or only moderately displaced, but

I could not tell precisely the position of the bones with relation to each other.

Q Is the taking of X-rays the ordinary and customary practice in determining the extent of a fracture and the nature of its healing?
A Yes.''

Dr. Akin's diagnosis of plaintiff's condition on September 6, 1941, was compound fracture with infection in the wound. He stated plaintiff's condition demanded immediate attention. We quote further from Dr. Akin's testimony:

''Q When you saw that condition on September the 6th a little before noon, you testified that condition demanded immediate attention, and then I asked you what was that immediate attention it demanded.

A I said it demanded immediate attention, having in mind when he was first injured, but the fact that I took him immediately to the hospital and operated on him, it goes without saying I thought he demanded immediate attention at that time, too.

Q And why did it demand hospitalization?

A In order to do an operation. We don't operate outside of the hospitals.

＊　＊　＊　＊　＊

Q What operation was performed?

A Taking the stitches out, opening the wound, making a second incision higher up, putting the finger down in the wound above and one below and finding out where this pus was coming from. We wished to drain it, provide an outlet to this infectious material and make it as complete as possible so that it would not be pocketed. In other words, we found a pocket of pus in between the two broken bones, and it was migrating or traveling upward in between the two bones, and it was important that it be released so that it wouldn't be ab-

sorbed, or danger of infection going into the blood stream, followed by any of the terrible complications that often ensue.

Q For instance?

A For instance, general sepsis or blood poisoning, endocarditis, an infection of the heart on the inner side, or pericarditis on the outer side, or a lung abscess, or a pleurisy, or a brain abscess.''

After Dr. Akin had refreshed his memory from hospital records, he repeated his diagnosis of plaintiff's case as,—

''Grossly infected left forearm secondary to compound fracture, dislocation of radius and ulna one week earlier.''

Dr. Alan Welch Smith, a physician and surgeon of Portland, Oregon, was called as a witness in behalf of plaintiff. After the requisite questions and answers qualifying Dr. Smith as an expert medical and surgical witness, a hypothetical question was propounded to him based upon the testimony of plaintiff's parents, plaintiff and Dr. Akin. Upon objection of defendants, the part of the question referring to the occurrence in Dr. Akin's office and the treatment accorded plaintiff in Portland was deleted, and Dr. Smith was asked what his answer would be assuming all the facts stated in the hypothetical question, except the portion so deleted, as to whether the treatment given by the doctor in Molalla was in accordance with general practice in communities similar to Molalla, and Dr. Smith answered: ''No, not in my opinion.''

Dr. Smith was asked to state what the generally accepted practice for the care and treatment of the type of case so mentioned would be in communities similar to that of Molalla, with due regard to the advanced state of medical science as of August, 1941.

Dr. Smith answered, "I would say that assuming that there was hospitalization handy and reasonable, that the case should first have been taken to a hospital."

We quote further from Dr. Smith's testimony:

Q (By Mr. Goldstein) Why, Doctor?

A Well, because it is a compound fracture. Maybe you don't know what a simple fracture is, and a compound fracture. A compound fracture is where it protrudes, goes out through the skin. That is a compound fracture.

Q And when you find a condition of a compound fracture, what does that indicate?

A Well, the end of your bone is bound to be contaminated. It picks up dirt, or picks up whatever substance it comes in contact with, and in a case of that kind you always expect an infection.

Q Then what is the standard practice in treating infections of that kind in contact with compound fractures?

A The standard, I would say, or universal, may I put it, treatment of a case of that kind is hospitalization first, X-rays next, irrigation, put it in a water bath, put it in a saline hot water bath, the whole arm, and the injection of anti-tetanus serum to prevent any tetanus developing from a wound of that character.

Q And where could that type of treatment be best given?

A Why, it can be given anywhere, as a matter of fact, but can best be given in a hospital.

Q And what would be the purpose of taking X-rays?

A Well, the purpose of X-rays is that you will determine exactly the location of the ends of the bones that are fractures, and the tissues involved, and just to what extent your bony structure is injured.

Q Assuming that an X-ray machine was available in the office of the doctor, what would have been the standard practice of an ordinary physician in a community similar to that of Molalla when confronted with a situation of that kind?

\* \* \* \* \*

A The general practice is, has been for the past fifteen or twenty years, to have an X-ray taken.

Q Now, what would you say as to whether or not X-rays should be taken during the course of the treatment?

A Repeatedly, to determine to what extent your injury is and how you are progressing.

Q What are the probable results of lack of care or hospitalization in treating an infection for a period of nine days?

A Well, most anything can happen; abscess formation, generation of gas, gas bacilli, and general infection involving muscles and nerves and veins.

Q What effect would that have upon the bones themselves?

. A Well, it would probably set up an osteo-myolitis. \* \* \*''

\* \* \* \* \*

Q (By Mr. Goldstein) Now, I wish you would look at the last exhibit taken, the last X-ray taken, being 'Plaintiff's Exhibit J', and state what condition you find resulted.

A Well, there is a fusion or solidification of bone. The bony structure is distorted and out of place and irregular. I would say that was the result of infection.

Q Assuming the truth of the hypothetical,—of the facts set forth in the hypothetical question, state in your opinion whether that condition that you see there reflected by 'Exhibit I' was attributable to the failure to treat and care for the infection.

A Yes.''

Defendants testify to an altogether different course which they claim to have taken in advising and treating plaintiff.

It is only fair to defendants to say that Dr. Albert Mount and Dr. C. A. Stewart, physicians and surgeons of Oregon City, Oregon, as witnesses in behalf of the defendants, when asked a hypothetical question based upon defendants' version of the treatment accorded plaintiff, testified that such treatment conformed to the practice and procedure approved and followed in such localities as Molalla, or for that matter generally without regard to locality. Moreover, these last named doctors testified in effect that no one could ascribe the unfortunate damage suffered by plaintiff to the treatment thus outlined as that given plaintiff by defendants.

In the light of the testimony of Dr. Akin and Dr. Smith, we cannot say that there was no medical testimony that the character of treatment required in plaintiff's case was as alleged in plaintiff's complaint.

It is not disputed that defendants did not advise hospitalization of plaintiff during the first eight days of their treatment and it is conceded that defendants made no use of their X-ray machine in treating plaintiff. As stated, as to the other charges of malpractice, the testimony is conflicting. We cannot say, however, that the disputed charges are not supported by testimony of a substantial nature. In the light of Dr. Smith's testimony, we are unable to say that there is no medical testimony to the effect that the alleged negligent treatment by defendants of plaintiff was the proximate cause of the damage sustained by plaintiff.

The record reflects two versions as to the course actually taken by defendants. The jury were called upon to decide which version was true. It is evident that the jury found that plaintiff had established his version by a preponderance of the testimony.

We find no error in the action of the trial court and hence, the judgment of that court is affirmed.