VÍCTOR CRUZ RODRÍGUEZ y OTROS, demandantes y recurrentes, *v.* CORPORACIÓN DE SERVICIOS DEL CENTRO MÉDICO DE PUERTO RICO, MUNICIPIO DE SAN JUAN y OTROS, demandados y recurridos.

*Número:* R-81-414     *Resuelto:* 17 de enero de 1983

720

*José F. Quetglas Álvarez, Roberto De Jesús Cintrón*, abogados de los recurrentes; *Francisco Agrait Oliveras*, abogado de los recurridos Dres. Francisco Rampolla, Martiniano Costas y José Abreu Álvarez, del Gobierno de la Capital, y Maryland Casualty Company; *Raymond L. Acosta, Fiscal Federal, Everett M. De Jesús, Fiscal Federal Auxiliar*, abogados del recurrido Dr. Juan Rodríguez Colón; *A. Santiago Villalonga*, de

*Hartzell, Ydrach, Mellado, Santiago, Pérez & Novas*, abogados del recurrido Dr. Carlos Grovas.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

La realidad del mundo y la naturaleza humana son muy complejas. Frecuentemente los tribunales somos llamados a dirimir controversias sobre problemas técnicos, con algunos de los cuales estamos poco familiarizados. En tales situaciones, mediante el estudio de las distintas fuentes accesibles del saber, ampliamos nuestros conocimientos y, aplicando la experiencia judicial y el sentido común, tratamos de lograr una prudente apreciación de lo razonable y arribar a un resultado justiciero.

■ Este es un caso plagado de controversias periciales médicas. En circunstancias como ésta hemos resuelto que estamos en la misma posición que los tribunales de instancia para evaluar y dirimir los conflictos entre las autoridades opuestas. *Velázquez* v. *Ponce Asphalt,* 113 D.P.R. 39 (1982); *Zambrana* v. *Hospital Santo Asilo de Damas,* 109 D.P.R. 517, 522 (1980), y casos allí citados. Expongamos los hechos.

I

El 5 de junio de 1969, aproximadamente a las 2:30 p.m., Wilmer Iván Cruz Osorio, de 10 años, mientras jugaba con sus amigos, cayó de un árbol a la tierra, donde había vidrios y piedras. Como consecuencia se hirió seriamente el brazo izquierdo (fractura compuesta o abierta) y fue llevado al Centro de Diagnóstico de Río Piedras. Dicho Centro presta servicios ambulatorios a través de un Departamento de Clínicas Externas. Atiende pacientes, provee medicamentos, y, de estimarse necesario, refiere ciertos casos al Centro Médico. En aquel entonces no contaba con un especialista en ortopedia. Previa evaluación, el menor fue referido y enviado en ambulancia al Centro Médico con un diagnóstico de fractura compuesta de la muñeca izquierda y una posi-

ble fractura del codo. En el Centro Médico, previas radiografías, fue atendido por el Dr. Carlos Grovas, facultativo residente del Hospital Universitario bajo el Programa Educacional de Ortopedia de la Escuela de Medicina, quien confirmó ese diagnóstico. [1] Entonces fue llevado al *Cuarto de Reducciones de la Sala de Emergencia*, donde, bajo anestesia general, se le hizo la reducción de las fracturas, se suturó la herida y se enyesó su brazo izquierdo. Además, el doctor Grovas le inyectó suero antitetánico y ordenó otra inyección intramuscular de 800,000 unidades de penicilina, que se le pondría en el Centro de Diagnóstico de Río Piedras. Este tratamiento tuvo lugar aproximadamente entre las 5:30 y las 8:00 p.m., escasas horas después de la caída. No fue hospitalizado por no haber camas disponibles.

Esa noche el dolor no dejó de aquejar a Wilmer Iván, por lo que al día siguiente fue llevado de nuevo al Centro de Diagnóstico de Río Piedras. Allí fue atendido por el Dr. Francisco Rampolla Briganti, quien lo refirió para evaluación a ortopedia del Centro Médico con observaciones respecto a la naturaleza de su lesión, que sufría dolor agudo, mostraba los dedos hinchados y aparentaba tener muy apretado el yeso.

No está claro cuál fue el tratamiento recibido por el menor ese día en el Centro Médico. El récord sólo contiene una breve anotación escrita por un médico no identificado, la cual alude a que el yeso estaba apretado; que se le había separado más; y a una indicación, aparentemente dirigida al ortopeda, en que hacía referencia a una bivalvulación del yeso.

Al otro día, 7 de junio, el menor fue nuevamente llevado al Centro de Diagnóstico de Río Piedras quejándose del dolor. Lo atendió otra vez el doctor Rampolla Briganti

---

[1] El récord médico refleja que el doctor Grovas diagnosticó fractura del húmero izquierdo, fractura de ambos huesos del antebrazo izquierdo y laceración en la cara anterior del antebrazo izquierdo.

quien volvió a referirlo al Centro Médico con anotaciones al efecto de que sufría dolor, tenía fiebre (38.8°C) y los dedos hinchados. Sus apuntes incluían referencia al tipo de lesión, a su diagnóstico previo de que el yeso estaba muy apretado y que el día anterior en el Centro Médico lo habían soltado un poco. *Además contenía una indicación de que había posibilidad y debería evaluarse una infección secundaria* (*"please evaluate pt. to R/O secondary infection"*).

Ese día fue atendido en el Centro Médico por el Dr. José Abreu, ortopeda del Hospital Municipal de San Juan. El tratamiento consistió en recetarle medicamentos para aliviar su dolor. La hoja correspondiente del récord contiene una referencia a su fractura, al hecho que el día anterior se le había aflojado el yeso porque estaba apretado, y que había sido referido para evaluar una posible infección secundaria. También se consigna la observación de que el niño tenía fiebre y lloraba constantemente. En la parte inferior del documento se incluye una indicación de que el niño lloraba muy fuertemente y que se trasladara a la Sección de Ortopedia.

El 8 de junio el menor fue llevado al Centro de Diagnóstico por cuarta vez en cuatro días. El médico que lo atendió, Dr. Martiniano Costa, volvió a referirlo al Centro Médico. Las anotaciones de este galeno llaman la atención al trauma sufrido por el menor y a su tratamiento, así como a que el yeso se le había aflojado dos días antes. Observa que el dolor y la hinchazón de los dedos continúan y que el yeso todavía luce apretado. Sugiere que lo examine un ortopeda.

En el Centro Médico el menor fue atendido por el ortopeda Dr. Juan Rodríguez Colón, quien se circunscribió a aflojar un poco más el yeso y recetarle medicamentos para calmar el dolor.

El 9 de junio, en lo que ya se había convertido en una patética rutina, el niño regresó al Centro de Diagnóstico de Río Piedras quejándose de dolor. El Dr. Arturo Añeses observó por primera vez cianosis en los dedos de su mano

izquierda y percibió un olor fétido, refiriéndolo para hospitalización inmediata al Centro Médico con observaciones de que se considerara un posible diagnóstico de celulitis o de gangrena gaseosa.

Ya en el Centro Médico el menor fue hospitalizado por órdenes y bajo el cuidado del doctor Grovas. No fue hasta ese momento, o sea *casi cinco días después de la intervención original,* que el yeso le fue removido. Se descubrió entonces que bajo el yeso su brazo estaba necrótico con señas de putrefacción. Los exámenes de tejido confirmaron el diagnóstico de gangrena gaseosa.

El 10 de junio, para salvarle la vida, el Dr. José Abreu procedió a la amputación del brazo izquierdo. Posteriormente apareció otra zona necrótica en la punta del muñón, y hubo que realizar una segunda operación, amputándole otra parte del brazo.[2]

A raíz de lo anterior, el menor y sus familiares presentaron demanda por daños alegando mala práctica de la medicina por los facultativos que lo atendieron. En sus méritos, el tribunal desestimó la acción. Acordamos revisar.

## II

A los fines de evaluar en su fiel perspectiva los planteamientos de las partes, en buena metodología expositiva, debemos precisar la naturaleza de la enfermedad que padeció Wilmer Iván.

La gangrena gaseosa o mionecrosis clostridia es causada principalmente por la bacteria anaerobia *Clostridium Perfringens (Cl. Welchii).*[3] Esta bacteria, al igual que otras de

---

[2] A pesar de que los demandados testificaron que la segunda operación se llevó a cabo con "fines estéticos" (la reconstrucción del codo) —y el tribunal de instancia así lo determinó— el récord revela que el verdadero motivo para esta intervención fue la aparición de una segunda área necrótica en la punta del muñón. Obviamente la primera no fue suficiente para extirpar la infección.

[3] *Cl. Perfringens* no es la única bacteria que ocasiona esta enfermedad. Weinstein y Barza enumeran cinco especies adicionales de clostridios que la producen. Weinstein y Barza, *Gas Gangrene,* 289 N. Engl. J. Med. 1129 (1973). Otros

su especie, se encuentra en gran abundancia en el suelo, las feces de los animales, y en el sistema digestivo y la piel humana. [4] Se caracteriza por llevar en su mayor parte una existencia *saprofita*, esto es, capaz de subsistir independientemente de otros organismos vivos. J.D. McLennan, *The Histotoxic Clostridial Infections of Man*, 26 Bacterological Rev. 177 (1962). P.D. Cantor, *Traumatic Medicine and Surgery for the Attorney*, Washington, D.C., Butterworths, Inc., 1963, pág. 257.

Aunque en condiciones normales son inofensivos, estos organismos pueden ser fuente de viciosas infecciones cuando las condiciones del cuerpo se trastocan. Así ocurre cuando existe algún trauma severo, tal como una fractura compuesta, donde por definición siempre hay una herida abierta o expuesta. Aufranc et al., *Gas Gangrene Complications, Fracture of the Tibia*, 209 JAMA, Núm. 13, 2045 (Sept. 1969). En esas circunstancias estos organismos penetran al cuerpo a través de la herida y se localizan en las zonas necróticas y carentes de oxígeno. Estas áreas, debido a su disminuido potencial de oxireducción, propician el crecimiento y la multiplicación de la bacteria. Este crecimiento se estimula todavía más, como ocurre normalmente en casos de heridas abiertas, si existen cuerpos extraños, tales como partículas de sucio, pedazos de ropa, y otros. [5] También se promueve cuando se reduce el flujo vascular y,

---

señalan que existe un tipo de infección clostridia que causa una gangrena más benigna que no produce gas. Darke, *Gas Gangrene & Related Infections*, 64 Br. J. Surg. 104 (1977).

[4] Harvey B. Simon y Morton N. Swartz exponen que las bacterias anaerobias predominan en la microflora de una persona saludable, aventajando a las bacterias aerobias y facultativas en una proporción de 10:1 en la piel, la cavidad oral, y el tracto genital de la mujer, y en una proporción de 1,000:1 en el colon. 2 *Scientific American Medicine*, Cap. V, *Anaerobic Infections* (1980).

[5] Swartz sostiene que la dosis mínima de *Cl. Perfringens* necesaria para producir gangrena gaseosa en un animal de laboratorio se reduce por un factor de 1,000,000 cuando se inyecta en un músculo devitalizado y contaminado con polvo estéril (*sterile dirt*), en vez de hacerlo en un músculo normal. Mandell et al., I *Principles and Practice of Infectious Disease*, Cap. 65, pág. 820 (1979).

por consiguiente, la irrigación del área. *Esto último puede ocurrir cuando se aplica un yeso apretado. Harrison's Principles of Internal Medicine*, 9na ed., 1980, págs. 961–962; Cecil y Loeb, *Tratado de Medicina Interna*, trad. por Alberto Folch, 14ta ed., Ed. Interamericana, 1977, T. I, pág. 408; Rockwood y Green, I *Fractures* 192 (1975); Cantor, *op. cit.*, pág. 261.

Una vez localizadas en esas áreas necróticas, estas bacterias pueden dar lugar a infecciones y enfermedades diversas. Por ejemplo, puede surgir una infección de tétano, el cual es ocasionado por la bacteria *Clostridium Tetani*, o también una "Cellulitis Clostridia" o "Mionecrosis Clostridia", ambas ocasionadas por la bacteria *Clostridium Perfringens*. Bornstein et al., *Anaerobic Infections: Review of Current Experience*, 43 Medicine 207–232 (1964); I *Campbell's Operative Orthopaedies*, 5ta ed., 1971, págs. 491–492; Simon y Swartz, *loc. cit.*

Se desconoce cuál es el mecanismo exacto que transforma el estado saprofito de la bacteria, en estado gangrenoso. Se sabe que la infección avanza, no mediante la propagación inmediata de la bacteria, sino a través de la producción de varias exotoxinas, la principal de las cuales es la Lecitinasa o a-toxina. Estas toxinas, según aumenta su concentración, van difundiéndose por el cuerpo y el sistema circulatorio. Su efecto es sumamente nocivo, ya que destruyen las paredes de la célula y causan la muerte celular. Esto, a su vez, genera nuevas zonas de tejido necrótico y de bajo potencial de oxireducción que son invadidas por las bacterias y constituyen un medio propicio para su crecimiento. Harrison, *op. cit.*, pág. 691; Weinstein y Barza, *Gas Gangrene*, 289 N. Engl. J. Med. 1129 (1973).

El proceso a veces es fulminante. El período de incubación varía de 6 horas a 6 semanas, aunque el promedio es

de 2 ó 3 días.[6] Mandell et al., I *Principles and Practice of Infectious Diseases*, Cap. 65, pág. 820 (1979).

La incidencia de la gangrena gaseosa no se conoce con precisión. Durante la Primera Guerra Mundial la hubo en aproximadamente 10% de las heridas abiertas. Cecil y Loeb, *op. cit.*, pág. 408. Para la Segunda Guerra Mundial se redujo al 1%. Respecto a las heridas abiertas civiles, los estudios citan una incidencia aproximada de 1.76 a 2 por ciento, a pesar de que hasta el 80% de todas las heridas abiertas mayores están inicialmente contaminadas por *Clostridium Perfringens*. Cecil y Loeb, *op. cit.*, pág. 408; Mandell, *op. cit.*, pág. 820; Rockwood y Green, *op. cit.*, pág. 194; y 4 *Lawyer's Medical Cyclopedia*, Rev. Vol., Sec. 30.21, pág. 209. Por otro lado, la cantidad de casos de gangrena en los brazos de los pacientes es considerable: 22.6% de todos los casos de gangrena gaseosa. Cantor, *op. cit.*, pág. 257.

La bacteria puede ser reconocida mediante una prueba con el tinte de Gram (grampositiva), o mediante el examen en laminilla de una muestra de tejido (frotis). Estos métodos, aunque rápidos, no son extremadamente precisos. La identificación exacta mediante cultivo puede tomar mucho tiempo y no ser útil para una diagnosis temprana. Cantor, *op. cit.*, pág. 261; Rockwood y Green, *op. cit.*, pág. 195. Sin embargo, ésta se puede apreciar a base de sus inconfundibles síntomas.

Mandell los describe así:

El principio es agudo. *El dolor es su síntoma más temprano e importante. Aumenta rápidamente en intensidad y es más severo que el dolor generalmente asociado con la lesión previa*

---

[6] Estas cifras no son exactas, representan un promedio de las que suplen nuestras fuentes. Véase Darke, *op. cit.*, pág. 105 (de 24 horas a 20 días); Harrison, *op. cit.*, pág. 692 (de 3 horas a 6 semanas); 2 *Scientific American Medicine*, Cap. V (de 8 a 72 horas); Weinstein y Barza, *op. cit.*, pág. 1130 (de 7 horas a 6 semanas); 1 *Gray Attorneys' Textbook of Medicine*, 3ra ed., Sec. 2.47(5) (de 6 horas a 2 días); Cantor, *op. cit.*, pág. 259 (de 8 horas a 6 días); Rockwood y Green, *op. cit.*, pág. 194 (de 12 horas a 24 horas); y 4 *Lawyer's Medical Cyclopedia*, Rev. Vol., Sec. 20.21, pág. 210 (de 24 horas a 2 días).

*o el tratamiento quirúrgico.* El paciente pronto luce severamente enfermo, pálido y sudoroso. El pulso es rápido, la presión sanguínea baja y a esto sigue el shock y la insuficiencia renal. *El paciente puede estar apático o puede estar aprehensivo e intranquilo pero mentalmente lúcido.* Puede sobrevenir delirio, estupor e inconsciencia. *Frecuentemente la fiebre está presente, aunque con alza de temperatura de menos de 38.3°C (101°F). La hipotermia es una pobre señal para diagnosticar y usualmente está asociada con el shock. La ictericia puede ser evidente. El proceso puede progresar rápidamente en cuestión de horas con un desenlace fatal a menos que se trate apropiadamente.* ([7]) (Énfasis nuestro.) *Op. cit.*, pág. 821.

A la par con estos síntomas también ocurren cambios visibles en el exterior de la herida.

[L]a herida se vuelve dolorosa y se hincha netamente. Unas horas más tarde después de empeorar los signos y síntomas, empieza a exudar un líquido claro pardusco en la herida y puede percibirse cierta crepitación en los tejidos vecinos. Comienza un cambio de color bronceado en el borde de la herida, que se difunde hacia afuera. Pueden aparecer ampollas llenas de líquido purpúreo. Muchos observadores describen un olor caracterizado como "olor a ratón". Por entonces el paciente puede estar anúrico y en colapso vascular irreversible. Cuando se expone el músculo por incisión tiene aspecto "cocido" o muerto —no sangra cuando se corta ni se retrotrae cuando se pincha. Los frotis del músculo afectado muestran un gran número de bacilos grampositivos, sin ningún otro germen, pero muy pocas células de pus. Los frotis y cultivos del exudado de la herida en la superficie pueden demostrar otros organismos además de los clostridios, especialmente en heridas muy contaminadas. Las radiografías muestran la presencia de gas en los haces musculares y su alrededor, en forma de helechos o de encaje. La mionecrosis por clostridios no tratada casi siempre resulta mortal.([8]) Cecil y Loeb, *op. cit.*, pág. 408.

---

([7]) Las autoridades confirman estos síntomas. Cantor, *op. cit.*, pág. 259; Harrison, *op. cit.*, pág. 962; Cecil y Loeb, *op. cit.*, pág. 408; Weinstein y Barza, *op. cit.*, pág. 1130; Gray, *op. cit.*, Sec. 2.47(5); Darke, *op. cit.*, pág. 109.

([8]) Véase también Mandell, *op. cit.*, pág. 821; Cantor, *op. cit.*, pág. 259; Wein-

Debido a que esta enfermedad se propaga rápidamente y a que su efecto es el de matar el tejido, su diagnóstico temprano es esencial para salvar la vida del paciente. Por lo mismo, el tratamiento más efectivo es el preventivo. Usualmente esto consiste en la limpieza y desbridamiento(9) de la herida abierta. Esto se hace removiendo mecánicamente todo el tejido necrótico que de otro modo podría servir de medio para las bacterias y lavando la herida de adentro hacia afuera con grandes cantidades de solución salina. Esta medida va acompañada usualmente de una receta de antibióticos, tal como la penicilina. De esta forma se consigue que sólo permanezca dentro del cuerpo una cantidad mínima de bacterias, las cuales, como carecen de un medio propicio para multiplicarse, pueden ser controladas por el propio sistema inmunológico del paciente. Rockwood y Green, *op. cit.*, págs. 126–134; 2 *Lawyer's Medical Cyclopedia*, Rev. Vol., Sec. 12.10, págs. 411–419.

Ahora bien, para asegurar la plena eficacia del desbridamiento éste debe ser efectuado dentro de un corto intervalo de tiempo después de que se ha sufrido la lesión. Esto usualmente significa un período de no más de 12 horas después del accidente. Durante este período las bacterias no han tenido oportunidad de penetrar profundamente en el cuerpo y asentarse. Así, pues, un desbridamiento concienzudo en este momento debe ser suficiente para eliminar la mayoría de ellas. Por el contrario, después de este período

---

stein y Barza, *op. cit.*, pág. 1130; Harrison, *op. cit.*, pág. 692; Darke, *op. cit.*, pág. 109; Gray, *op. cit.*, Sec. 2.47(5); 4 *Lawyer's Medical Cyclopedia*, Rev. Vol., Sec. 30.21, pág. 210.

(9) "Desbridamiento (del fr. *debridement*). m. División de bridas constrictivas, como en las heridas. Dilatación cruenta de una herida, de un orificio natural, para facilitar la salida de un cuerpo extraño o normal, cohibir una hemorragia, etc. Término adoptado generalmente en la guerra de 1914–1918 para el tratamiento de las heridas infectadas, que consiste en la escisión de todos los tejidos que rodean inmediatamente la herida y la extracción de cuerpos extraños y esquirlas." L. Cardenal, *Diccionario Terminológico de Ciencias Médicas*, 4ta ed., Barcelona, Ed. Salvat, 1952, pág. 360.

la efectividad del desbridamiento es cuestionable. 2 *Lawyer's Medical Cyclopedia*, Rev. Vol., Sec. 12.10, pág. 416.

Sin embargo, la técnica del desbridamiento no es infalible. Hemos visto que aproximadamente el 2.5%[10] de las heridas contaminadas, posteriormente desarrollan gangrena gaseosa. Esto se puede deber a muchos factores: desbridamiento insuficiente o tardío, áreas necróticas no observadas de primera intención, y otros. En estos casos, es necesario volver a abrir la herida y efectuar un nuevo y más amplio desbridamiento. A tiempo, es un remedio eficaz. Altemeier y Fuller, *Prevention and Treatment of Gas Gangrene*, 217 JAMA, Núm. 6, págs. 806–812 (1971); Rockwood y Green, *op. cit.*, pág. 196; 1 *Gray Attorneys' Textbook of Medicine*, 3ra ed., Sec. 2.47(5). Si la infección se ha desarrollado y el área de tejido necrótico es tan grande que hace inservible el miembro afectado, es menester acudir al remedio radical de la amputación para salvar la vida del paciente.

Otros posibles tratamientos incluyen la administración de antitoxinas, lo cual no está siempre recomendado, pues existe el riesgo de una reacción anafiláctica. También el llamado tratamiento de oxígeno hiperbárico, que consiste en la administración de oxígeno a alta presión dentro de una cámara cerrada. Este último tratamiento, aunque controvertible, ha llegado a producir buenos resultados, a pesar de que también conlleva riesgos de paros respiratorios, convulsiones y otras complicaciones. Rockwood y Green, *op. cit.*, pág. 196; Harrison, *op. cit.*, pág. 964.[11]

La mortalidad en los casos de gangrena oscila entre un 15% y un 45%. Cantor, *op. cit.*, pág. 263; 2 *Scientific American Medicine*, Cap. V, *Anaerobic Infections* (1980). Camp-

---

[10] El 80% de todas las heridas están contaminadas y el 2% de todas las heridas desarrollan gangrena gaseosa. Por lo tanto, es razonable concluir que el 2.5% de todas las heridas contaminadas desarrollan gangrena gaseosa.

[11] Véase principalmente el estudio de este tratamiento en 88 casos a través de un período de 10 años, informado en Darke, *op. cit.*, pág. 105.

bell señala que el porcentaje de muertes es significativamente mayor en casos en que la gangrena se desarrolla en los muslos o nalgas o abdomen del paciente, comparados con los casos en que la gangrena surge en las porciones distales de las extremidades. *Op. cit.*, pág. 494.

Aclarada la etiología, sintomatología y tratamiento de la gangrena gaseosa, examinemos los señalamientos de las partes.

### III

Los recurrentes alegan que el tribunal de instancia incidió al decidir que no había habido negligencia en el tratamiento médico recibido por el menor. En síntesis, sostienen que los médicos fueron negligentes en los siguientes extremos: (1) no limpiar y desbridar la herida al efectuar la reducción de la fractura; (2) suturar la herida de forma inmediata; (3) cubrir la herida con un yeso circular; (4) no crear una "ventana" en el yeso aplicado; (5) no hospitalizar al menor; y (6) hacer caso omiso de los síntomas de su condición. Observamos que las primeras cinco alegaciones van dirigidas a las acciones efectuadas por el doctor Grovas, mientras que la última se dirige a los restantes doctores que atendieron a Wilmer Iván. Analicemos.

En esa tarea es menester reconocer que la responsabilidad de los médicos es brindar a sus pacientes aquella atención que, a la luz de los modernos medios de comunicación y enseñanza, satisface las exigencias profesionales generalmente reconocidas por la propia profesión médica. *Oliveros* v. *Abréu*, 101 D.P.R. 209 (1973); *Morales* v. *Hosp. Matilde Brenes*, 102 D.P.R. 188 (1974); *González* v. *E.L.A.*, 104 D.P.R. 55 (1975); *López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197 (1978); *Negrón* v. *Municipio de San Juan*, 107 D.P.R. 375 (1978). Así, un error de juicio en cuanto al diagnóstico o al tratamiento constituye una defensa cuando las autoridades médicas están en desacuerdo sobre cuál es el diagnóstico o tratamiento adecuado.

*Oliveros* v. *Abréu*, supra, págs. 227–228; *Morales* v. *Hosp. Matilde Brenes*, supra, pág. 194; *Rosado Rosado* v. *E.L.A.*, 108 D.P.R. 789, 795–796 (1979). En *Oliveros*, supra, dijimos:

Como puede verse, al médico se le reconoce amplia discreción profesional en su trabajo; no es responsable de mala práctica cuando se enfrenta a una situación en la cual cabe duda educada y *razonable* sobre cuál debe ser el curso a seguir. (Énfasis nuestro.) Pág. 228.

En virtud de lo expuesto, así como de la naturaleza de la enfermedad que posteriormente padeció Wilmer Iván, analicemos si desde su origen el 5 de junio de 1969, se siguió un tratamiento adecuado.

Esa tarde el doctor Grovas se vio enfrentado con un caso de emergencia consistente en una fractura *compuesta*, [12] que venía sucia con polvo y tierra. Es un principio elemental de la medicina que la prioridad en estos casos es la limpieza y el desbridamiento de la herida. Se reconoce que proceder directamente a la restauración de la estructura ósea sin antes procurar el mayor grado posible de asepsia podría conllevar que se desarrollaran infecciones que a la larga tienden a estropear la labor invertida, impidiendo una unificación satisfactoria del hueso. [13] *Goldsmith Practice of Surgery, Orthopaedics*, Rev. Ed., Cap. 6, pág. 2 (1981). Campbell resume así este enfoque:

Según expresado anteriormente, el objeto del tratamiento de las fracturas lo es el establecer la unión en una posición satisfactoria y devolverle la máxima funcionalidad a la parte lastimada. Pero en fracturas compuestas el tratamiento de la herida y la prevención de infecciones piogénicas y clostridiales es de primordial importancia. El objeto del trata-

---

[12] Una fractura compuesta o abierta es "[a]quella en la que existe una herida de partes blandas que comunica el sitio de la fractura con el exterior". Dorland, *Diccionario de Ciencias Médicas*, 6ta ed., Argentina, Ed. El Ateneo, 1979, pág. 578.

[13] Inferimos que el doctor Grovas estaba familiarizado con esta posibilidad, según demuestra el que recetara al menor una dosis de .5cc de toxoide de tétano y 5 millones de unidades de penicilina acuosa.

miento de emergencia es convertir una herida contaminada en una herida limpia, promoviendo así la cura temprana de los tejidos blandos y la transformación de una fractura potencialmente infectada a una cerrada y sanada. El tratamiento del hueso fracturado es de secundaria importancia. *Op. cit.*, pág. 490.

Los demandantes aducen que la herida no fue limpiada ni desbridada antes de procederse a la reducción de la fractura. Sin embargo, el tribunal de instancia concluyó lo contrario basándose únicamente en el testimonio del doctor Grovas. Notamos la ausencia en el récord del menor de toda referencia a este procedimiento, pese a que fue hecho bajo anestesia, como parte de la intervención que se le practicó, y que se recomienda que se lleve un récord detallado de lo que se le hace al paciente. Hayt, *Medico-Legal Aspects of Hospital Records*, 2da ed., 1977, págs. 29–32.

■ En *Reyes* v. *Phoenix Assurance Co.*, 100 D.P.R. 871 (1972), señalamos la importancia de que los records médicos reflejen lo más fielmente posible todas las circunstancias de la atención brindada. Dijimos:

> Aunque la falta de dichas anotaciones en el récord no necesariamente constituye negligencia *per se*, dicha omisión puede ser un factor a considerarse en la credibilidad que el médico merezca al tribunal con respecto al tratamiento que dio al paciente. La clase médica puede protegerse contra algunos pleitos injustificados con un récord médico completo y adecuado. Pág. 880.

La justificación que dio el doctor Grovas para haber omitido señalar estos datos fue que el desbridamiento era un procedimiento tan rutinario que se le había olvidado anotarlo. Aunque su explicación es razonable, no deja de proyectar dudas en cuanto a su aceptación, lo que nos mueve a tomarla con reservas. Sin embargo, no necesitamos pasar juicio sobre el crédito que debió merecer su testimonio, pues, como veremos, existen otros factores condicionantes que nos permiten llegar a la solución apropiada.

Aparte de lo expuesto, es claro que aunque el doctor Grovas hubiese limpiado y desbridado la herida, este procedimiento no fue eficaz para prevenir la infección subsiguiente. Lamentablemente ocurrió, aunque la fractura fue atendida apenas tres horas después del accidente. Hemos visto que ese momento profilácticamente era muy oportuno, pues los microorganismos por lo general no han tenido oportunidad de penetrar profundamente en el cuerpo. Si bien esa realidad no es suficiente para contradecir el testimonio del doctor Grovas, da motivos adicionales para cuestionar si en realidad el desbridamiento se hizo en forma adecuada. (14)

El segundo planteamiento de los recurrentes es que el doctor Grovas, al proceder a suturar la herida una vez había reducido la fractura, siguió un tratamiento no recomendado. Se nos sugiere que el procedimiento correcto era dejar la herida abierta de primera intención. Argumentan que de ese modo, de surgir una infección se podía detectar y controlar con mayor facilidad.

En la vista del caso todos los demandados, como peritos propios, —ortopedas Dr. Carlos Grovas, Dr. Juan Rodríguez Colón, Dr. José Abreu y el generalista Dr. Francisco Rampolla— declararon que cerrar la herida es un procedimiento necesario para evitar una posterior contaminación de la misma que dificulte la unión del hueso. Por su parte, los demandantes intentaron demostrarlo mediante la presentación de textos reconocidos en el campo de esta especialidad. Sin embargo, el tribunal de instancia concluyó que "[l]as autoridades médicas presentadas por la parte demandante mediante textos no fueron claras sobre este extremo y [que] existe una seria discrepancia pericial sobre ello".

_____

(14) Observamos, además, que el doctor Grovas realizó este procedimiento en un cuarto de la Sala de Emergencia. Aunque no es decisivo, las autoridades señalan que este es un proceso que requiere un máximo de asepsia y recomiendan que se lleve a cabo en la sala de operaciones. 2 *Lawyer's Medical Cyclopedia*, Rev. Vol., Sec. 12.10, pág. 417; Rockwood y Green, *op. cit.*, pág. 127; *Goldsmith Practice of Surgery, Orthopaedics*, supra, pág. 2.

El estudio de las autoridades médicas invocadas tiende a sostener la posición de la parte actora: Campbell, *op. cit.*, pág. 490; Rockwood y Green, *op. cit.*, pág. 135; F. M. Smith, *Cirugía del Codo*, trad. por Abad Rico et al., Barcelona, Ediciones Torray, 1976, pág. 215. Sin embargo, de su lectura surge que existe un debate legítimo sobre cuál es el método recomendable en estas situaciones ante el dilema de lograr una pronta unión del hueso afectado *vis-à-vis* mantener las infecciones bajo control.[15] Ambos conllevan ciertos riesgos. La cuestión se explica así:

> Parece haber pocas dudas de que los huesos fracturados sanan más rápido y eficazmente cuando están envueltos en tejido blando, plegable y libre de infección. Así, como ha señalado Brav [cita omitida], uno de los objetivos tempranos del tratamiento de fracturas abiertas es el de convertirlas en [fracturas] cerradas. Claramente, la cura puede esperarse más prontamente si la herida se cierra primariamente por suturas, si no hay dificultades. *Y aquí yace el problema.* Cuando surge una infección en la parte profunda de una herida cerrada, puede que no anuncie su aparición prontamente, y puede suceder que pase algún tiempo antes de que la porción visible de la herida ofrezca alguna indicación de la presencia de la infección profunda. Durante este intervalo, el pus acumulado, sellado de toda salida a la superficie, se comporta como un absceso, disecando a lo largo de los planos de tejido y usualmente alrededor de los fragmentos del hueso fracturado. *Es el espectro de una infección así y de sus consecuencias el que debe tener en su mente un cirujano que esté considerando el cierre primario por sutura. . . .* (Énfasis suplido.) Rockwood y Green, *op. cit.*, pág. 135.

En consideración a este enfoque, y a base de la explicación ofrecida por el doctor Grovas, fácil es deducir que su

---

[15] En el momento presente la posición predominante parece ser la de que no se debe cerrar la herida, a la luz de los mejores resultados obtenidos al seguir este procedimiento durante la Guerra de Vietnam. Se ha llegado a decir que una gangrena gaseosa surgida a raíz de un trauma debe ser considerada como un error del facultativo. Véase Cameron y Ford, *Gas Gangrene—Need it Occur?* 119 C.M.A. Journal 1207 (Nov. 1978).

actuación de suturar la herida de forma inmediata estuvo motivada por su legítima preocupación, como ortopeda, de conseguir la mejor y más pronta unión del hueso fracturado. Sin embargo, causa inquietud que ese curso de acción podía confligir con la temprana detección de una infección que, *en la buena práctica de la medicina, debe tener prioridad sobre un pronto alineamiento del hueso.* Concluimos que al adoptar esa decisión lo hizo utilizando su mejor juicio profesional. Sin embargo, tal proceder conllevaba un riesgo calculado, previsible y reconocido por la profesión médica.

■ No es función de este Tribunal prescribir tratamientos médicos. Comprendemos que cada paciente puede presentar circunstancias particulares que hagan que un tratamiento específico sea o no sea recomendable.[16] También reconocemos que toda cura médica conlleva cierto tipo de riesgo de alguna clase. Por esta razón hemos reconocido la necesidad de que los médicos hagan uso de su criterio profesional informado enriquecido con la experiencia y la madurez —en la doctrina de que un error honesto de juicio no genera responsabilidad. Ello no significa una renuncia del foro judicial a su función adjudicativa de determinar en cada caso individual si la actuación del profesional es razonable, a tenor con el estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, y si genera responsabilidad.

---

[16] En *Quiñones* v. *Duarte Mendoza,* 112 D.P.R. 223, 226 (1982), señalamos a manera de *dictum,* que era "de conocimiento generalizado que siempre que se interviene quirúrgicamente a una persona, se le deben administrar antibióticos preventivamente para evitar infecciones. No se requiere conocimiento médico-técnico superespecializado para concluir que el haber practicado un aborto sin haber recetado antibióticos constituye negligencia".

Esas expresiones deben evaluarse a la luz de las circunstancias particulares allí presentes de indebida asepsia y falta de equipo en la realización de un aborto causante de "una infección e inflamación pélvica" en la oficina privada de un médico. No significa que como parte del abecedario médico, en todo caso sea menester la administración de antibióticos, aun en aquellos casos en que, conforme la buena práctica de la medicina, sea contraindicado.

Nos corresponde, pues, esa evaluación. Hemos visto que el doctor Grovas se enfrentó con la disyuntiva de suturar o no suturar la herida de Wilmer Iván. Escogió suturar. ¿Cuáles eran las posibles consecuencias de ese curso de acción?

La encrucijada de un médico ante estas circunstancias ha sido expuesta del siguiente modo por el ilustre cirujano Dr. Clay Ray Murray:

> Ahora, cuando usted ha hecho esto [limpieza y desbridamiento de la herida], una cosa que puede decir es: "Le he hecho un mínimo de daño a este paciente." Créanme, ésta es una magnífica confesión que se puede hacer.
>
> Segundo, usted puede decir: "He eliminado todo el tejido muerto que pude encontrar, todo el que creo que está muerto, y todo el tejido que creo que se va a morir. No he dejado espacios necróticos, y he salvado todo el tejido viable hasta donde puedo juzgar."
>
> Bueno, debería haber alguna diversión en esto. Así pues, vamos a hacer una pequeña apuesta con el paciente. Desde luego, él está inconsciente, pero no objetaría si estuviera consciente. *Voy a apostar mi juicio profesional contra su pierna. El problema es si vamos a cerrar esta herida o no.* Desde luego, me podría equivocar, pero vamos a hacer de esto un evento deportivo. Así, voy a apostar mi juicio contra su pierna y voy a cerrar esta herida. No es una buena apuesta para el paciente, porque a cara usted gana y a cruz él pierde. No tiene una oportunidad. Si se alivia, usted es un magnífico doctor. Si no, mala suerte.
>
> En cualquier otro lugar del cuerpo, si fuéramos a introducir microbios a los tejidos y quisiéramos asegurarnos de que crecerían, crearíamos tensión en los tejidos. Sería un ambiente ideal para crear una infección. Sabemos que, cuando una porción del cuerpo es lastimada por un trauma, se hincha, surge hemorragia, edema, exudado inflamatorio, y los tejidos se hinchan. La hinchazón causa tensión, siempre y cuando esté confinada.
>
> Así, dándonos cuenta de que estamos tratando con una herida en que todavía podemos haber dejado tejido muerto y en la que ciertamente hay tejido traumatizado, y en la que sabemos que hemos dejado algunos microbios, con la herida

abierta no puede haber tensión, porque los edemas y exudados simplemente se filtran a través de la herida. No consideramos esto una proposición deportiva. . . . (Conferencia dictada ante la Central States Society of Industrial Medicine and Surgery en el año 1940 y citado en 2 *Lawyer's Medical Cyclopedia*, Sec. 12.10, págs. 417–418.) [17]

Notamos, pues, como primera consecuencia, que de elegir suturar la herida el doctor Grovas tenía o debía ser consciente de que podía estar contribuyendo a que se desarrollase una infección, a la vez que disminuía las probabilidades de su temprana detección.

A la suturación primaria y total siguió la colocación de un yeso circular. Existe controversia sobre si este tratamiento es recomendable, expresándose en la afirmativa los peritos demandados y en parecer contrario los textos presentados por los demandantes. Aparte de las generalizaciones que la ciencia permita hacer, el efecto inmediato de esa medida en el brazo de Wilmer Iván fue entorpecer en mayor grado aún la observación de una infección que de ordinario manifiesta cambios fisiológicos visibles en la superficie de una herida.

Lo expuesto nos sugiere una interrogante: ¿Existían alternativas a la colocación del yeso circular? Sí. El doctor Grovas tenía la opción de evitar este riesgo, tomando la precaución de dejar una "ventana" en el yeso. La técnica requiere que se corte un pedazo de yeso después de instalado, de manera que el área de la herida sea visible. Este pedazo se vuelve a colocar luego en su lugar, de modo que forme una especie de tapa que permita posteriormente la observación directa de la herida cuantas veces sea necesario. Rockwood y Green, *op. cit.*, pág. 145. [18]

---

[17] En su disertación, el doctor Murray combate la opinión —sostenida por los aquí demandados— al efecto de que el dejar la herida abierta puede ocasionar contaminación adicional, señalando que aun en caso de ser esto cierto, éste es el riesgo menor de los dos, ya que con la herida abierta la infección se hace más fácil de controlar.

[18] Otra posibilidad con que contaba el doctor Grovas era la de "bivalvular"

Durante el juicio se le preguntó al doctor Grovas por qué no había tomado esta precaución. Su única contestación fue que no lo creyó necesario. Ello es indicativo de que ya en ese momento este galeno había descartado la posibilidad de infección en la herida. Tal decisión tenía el efecto de minimizar aún más la posibilidad de que si surgía alguna infección fuera descubierta oportunamente. Con ella el doctor Grovas incurría en mayores riesgos aún porque, como señalan Rockwood y Green, "ver es saber, no ver es adivinar". *Op. cit.*, pág. 146.

Finalmente, alegan los demandantes que el doctor Grovas debió haber hospitalizado al menor para tenerlo bajo observación. Según surge de los autos, el doctor Grovas instruyó a los padres del menor que lo trajeran de nuevo a la "próxima Clínica de Ortopedia" y que lo llevaran al Centro de Diagnóstico para ser evaluado dos veces al día. Existe controversia entre lo opinado en el juicio por los peritos y las autoridades sometidas por los demandantes en torno a si era "imprescindible" su hospitalización. Se acepta que era recomendable. Al no ser ingresado, disminuyeron aún más las ya pocas oportunidades de que la incipiente infección de Wilmer Iván fuera descubierta por el doctor Grovas u otro ortopeda. En las circunstancias específicas de este caso, al trasladar la responsabilidad de la evaluación del menor al Centro de Diagnóstico —donde los doctores no estaban totalmente familiarizados con el tratamiento efectuado al menor y donde no se contaba con las facilidades óptimas para enfrentar una emergencia— el doctor Grovas demostró un exceso de confianza, incurriendo en riesgos innecesarios.

---

(*bivalve*) el yeso. Este procedimiento consiste en abrir el yeso por completo cortándolo a través de un solo lado, de manera que luego pueda cerrarse como una concha. Esto, aunque no permite la observación directa de la herida, sirve para disipar la presión que pudiera ejercer el yeso sobre ella, sin restar a la inmovilización de la extremidad. En este caso, esta simple medida hubiera evitado el diagnóstico equivocado de que el yeso estaba apretado y hubiera podido adelantar la detección de la enfermedad del menor.

Lo expuesto representa una evaluación del tratamiento brindado por el doctor Grovas. Hemos apreciado que, a cada paso, tuvo distintas alternativas, cualesquiera pudieron haber servido para cancelar, contrarrestar o reducir el efecto negativo que sus otras acciones iban creando sobre la infección de Wilmer Iván. Sin embargo, consistentemente eligió el curso que minimizaba la posibilidad de detectar en tiempo dicha infección e indirectamente contribuyó a estimularla. La totalidad de sus acciones acusan indiferencia y pobre juicio profesional frente a la posibilidad real de que, dada la naturaleza de la lesión, ocurriera una infección, tal como la gangrena gaseosa. Más que un simple error de juicio inicial, la suma total de sus actuaciones y omisiones concomitantes y subsiguientes señalan indefectiblemente hacia una conclusión de negligencia profesional. La mejor práctica de la medicina exigía que se tomaran las precauciones indicadas.

■ Las autoridades consultadas están unánimes a los efectos de que una herida abierta y sucia es sumamente propensa a desarrollar algún tipo de infección, y que la atención y tratamiento médicos deben prever esta posibilidad. Se impone un enfoque clínico de activa cautela. M. Grossman y Silen, *Serious Post-Traumatic Infections with Special Reference to Gas Gangrene, Tetanus and Necrotizing Facitis*, 32 Postgrad. Med. 110–113 (1962). Gray, *op. cit.*, Sec. 2.47(5); Campbell, *op. cit.*, pág. 490; Smith, *op. cit.*, pág. 217; Cantor, *op. cit.*, pág. 261; Mandell, *op. cit.*, pág. 135; 2 *Lawyer's Medical Cyclopedia*, Rev. Vol. Sec. 12.24, pág. 435; *Goldsmith*, supra, pág. 2. No obsta que en el caso de autos la infección que finalmente se manifestara fuera poco común. Ello en nada reducía la obligación del médico de prever esa posibilidad.

■ La aplicabilidad de la doctrina sobre error de juicio, como eximente de responsabilidad médica —*Oliveros* v. *Abréu*, supra, págs. 227–228— está limitada a que el error sea *razonable*. No puede considerarse *razonable* un trata-

miento que somete a un paciente a riesgos innecesarios y previsibles, cuando se cuenta con medios alternos para evitarlos o disminuirlos.

El tribunal de instancia en este caso dio gran importancia a nuestra decisión de *Torres Pérez* v. *Hosp. Dr. Susoni, Inc.*, 95 D.P.R. 867 (1968), en que decidimos que no había responsabilidad. El caso es distinguible. Se estableció enfáticamente la forma en que la limpieza y el desbridamiento de la herida se llevaron a cabo; que el médico encargado tomó las precauciones de aplicar suero antigangrenoso, y de bivalvular el yeso del paciente; y, que este último permaneció hospitalizado bajo la alerta vigilancia de otros facultativos. Ninguno de estos factores están presentes en el caso de autos. Nuestra decisión en aquel caso en nada contradice éste. Véase: *Williams* v. *Vandenhoven*, 482 P.2d 55 (1971).

## IV

Hemos visto que la imputación de responsabilidad del doctor Grovas se funda en su omisión de tomar las precauciones necesarias contra la posibilidad de una infección. De igual forma, todos los galenos que intervinieron con el niño en el Centro Médico durante su viacrucis post-operatorio descartaron, sin ninguna explicación, la alta posibilidad real de un proceso infeccioso, aun cuando hubo observaciones y referimientos específicos desde el Centro de Diagnóstico dirigidos hacia tal evaluación. A escasas horas de la operación, comenzó una sintomatología compatible con el desarrollo de una seria infección. Lamentablemente el tratamiento general seguido se circunscribió a aflojar el yeso y suplir analgésicos para mitigar el dolor. Se descartó así que el yeso estuviera apretado como resultado de la inflamación e hinchazón del brazo debido a esa infección. No se ordenó su hospitalización para investigación y tratamiento más adecuado, aun cuando todos los indicadores objetivos lo sugerían.

Comenzando desde la mañana del 6 de junio hasta el momento en que por fin fue descubierta la gangrena —cuatro días más tarde— dichos médicos tuvieron ante sí una serie de síntomas que apuntaban inequívocamente a la naturaleza del padecimiento de Wilmer Iván y que, de haber sido atendidos, tal vez se hubiera podido prevenir la pérdida del brazo.

Primeramente, el dolor intenso que padecía y que continuaba pese a los calmantes suministrados. Hemos visto que ello es señal inconfundible de una infección. En segundo lugar, los signos de fiebre e hinchazón de los dedos. Estos síntomas eran indicios claros de que se estaba desarrollando una infección. Y tercero, estaba presente la propia sensación de apretamiento que tenía el menor en su brazo. Aunque esta manifestación pudo haber sido causada —como de primera intención interpretaron los galenos— porque el yeso estuviera muy apretado, la presencia de los otros síntomas mencionados debió alertarlos de que su génesis era la propia herida, que estaba hinchándose debido a la infección. Debía inclusive explorarse e investigar si el propio yeso podía estar contribuyendo a su desarrollo al reducir el flujo vascular y, por ende, la irrigación natural del brazo.

Repetimos, la persistencia y características de los síntomas debieron haber alertado a los médicos de que algo andaba mal en la herida del menor. Constituían avisos y motivos suficientes para que el yeso fuera removido y examinaran directamente la misma. Una infección postraumática es una posibilidad real que siempre está presente en una fractura abierta. No atender esa posibilidad y no brindar al menor la atención que requería su condición, constituyen omisiones que se traducen en mala práctica profesional. *Casey* v. *Penn*, 360 N.E.2d 93 (1977), confirmado en 362 N.E.2d 1373; *Scott* v. *Salem County Memorial Hospital*, 280 A.2d 843 (1971); *McCay* v. *Mitchell*, 463 S.W.2d 710 (1970); *United States* v. *Morin*, 229 F.2d 824 (1956); *Vann* v.

*Harden*, 47 S.E.2d 314 (1948); *Rowell* v. *Todd*, 155 P.2d 314 (1945); *Maxwell* v. *Howell*, 174 S.E. 553 (1934); *Gamradt* v. *Du Bois*, 230 N.W. 774 (1930); *Malpractice: Treatment of Fractures or Dislocations*, 54 A.L.R.2d 200, Secs. 10–12. Véase, además, A. R. Holder, *Medical Malpractice Law*, New York, N.Y., John Wiley & Sons, Inc., 1975, págs. 110–112; *Liability for Gas Gangrene*, 221 JAMA 1083 (Aug. 1972); *Liability in "Tight Cast" Cases*, 217 JAMA 1767 (Sept. 1971).

V

Establecida la negligencia en el tratamiento, concentrémonos en la determinación del tribunal de instancia de que la pérdida del brazo se debió, con mayor probabilidad, al curso inexorable y normal de la infección de gangrena gaseosa, antes que a las acciones de los facultativos demandados. Este criterio lo basó en la deposición del Dr. Eduardo Parrilla, generalista y perito de la parte demandante. Éste declaró que era posible que la bacteria hubiese penetrado en la herida en el mismo sitio del accidente; que a veces es posible que el desbridamiento no logre eliminar todas las bacterias; que una vez que surge la infección, el tratamiento es dudoso; y que, en 24 años como médico, nunca había visto un caso de gangrena gaseosa que no hubiese culminado en una amputación. Como consecuencia, el tribunal concluyó que con toda probabilidad la bacteria había penetrado en la herida en el mismo lugar del accidente, y que una vez había sobrevivido el desbridamiento efectuado, la infección y la consiguiente amputación del brazo eran resultados "inevitables".

Coincidimos en que es razonable inferir que la bacteria penetró en la herida en el momento del accidente. Discrepamos del curso inevitable que le atribuye el tribunal. Ciertamente la mionecrosis clostridia es una enfermedad sumamente viciosa, que ataca con gran rapidez. Según hemos indicado, su mortalidad es alta. La amputación de un

miembro es un resultado frecuente, aun cuando se haya cumplido con todas las exigencias de la buena práctica de la medicina, si no se descubre a tiempo. Diversas razones —algunas atribuibles al paciente y otras a falta de recursos— pueden contribuir. También es correcto, si bien poco probable, que la infección se desarrolle después de un desbridamiento oportuno y adecuado. Sin embargo, nada de lo anterior implica, como concluyó el tribunal de instancia, que la infección de gangrena gaseosa sufrida por Wilmer Iván *inevitablemente* tenía que culminar en la amputación de su brazo. Los tratadistas reconocen que el remedio drástico de amputación puede ser evitado mediante el diagnóstico y tratamiento oportuno y efectivo de la infección. Altemeier y Fuller, *op. cit.*, pág. 312; Rockwood y Green, *op. cit.*, pág. 196; Drake, *op. cit.*, pág. 110; Gray, *op. cit.*, Sec. 2.47(5). En otras palabras, la amputación de un miembro no es un curso inexorable, salvo cuando la infección ha avanzado a ciertos extremos.

■ La norma jurídica establecida para este tipo de casos es que el demandante tiene que probar, mediante la preponderancia de la prueba, que las acciones negligentes del demandado fueron el factor que con mayor probabilidad ocasionó el daño sufrido. *Zambrana* v. *Hospital Santo Asilo de Damas*, supra, pág. 521; *Vda. de López* v. *E.L.A.*, 104 D.P.R. 178, 183 (1975); *Rivera* v. *E.L.A.*, 99 D.P.R. 890, 898-899 (1971); *Reyes* v. *Phoenix Assurance Co.*, supra, pág. 876. No es necesario establecer ese hecho con precisión matemática —*Zambrana* v. *Hospital Santo Asilo de Damas*, supra, pág. 521; *Castro* v. *Payco, Inc.*, 75 D.P.R. 63, 75 (1953)— ni tampoco eliminar toda otra posible causa de daño. *Rivera* v. *E.L.A.*, supra, págs. 898-899; *Zambrana* v. *Hospital Santo Asilo de Damas*, supra, pág. 521. Véase además *Soc. de Gananciales, Etc.* v. *Presbyterian Hosp.*, 88 D.P.R. 391, 404-408 (1963).

Por otro lado, se ha señalado la dificultad que existe en este tipo de casos para establecer cuál es el factor de mayor

probabilidad, máxime cuando se trata de la omisión de los doctores de brindar un tratamiento cuyos resultados no se pueden asegurar. H. Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico*, 1980, págs. 7–41; Holder, *op. cit.*, págs. 57–59; Annot., *Proximate Cause in Malpractice Cases*, 13 A.L.R.2d 11, Secs. 1–3, 8 y casos allí citados.

Admitimos que en el presente caso el éxito del tratamiento de la infección de gangrena gaseosa no estaba garantizado. Este hecho en modo alguno era un eximente de la obligación de los médicos que atendieron a Wilmer Iván en el Centro Médico de tomar todas aquellas medidas que exigía la buena práctica de la profesión. Reiteramos que la pérdida del brazo no era un resultado forzoso. Las oportunidades de salvarlo eran mayores, de haberse detectado en sus inicios el proceso y la naturaleza de la infección. Esa opción quedó absolutamente eliminada por las acciones de los médicos del Centro Médico a cuya atención se encomendó el menor. Hemos señalado el período de incubación de la bacteria. Aquí los síntomas estuvieron presentes casi de inmediato. Ante esta realidad es razonable concluir que la negligencia de los demandados permitió que la infección pudiese propagarse inadvertida y descontroladamente. Cuando fue descubierta se había extendido a tal extremo que no fue suficiente con una sola amputación del brazo, sino que hubo que volver a cortarle otra parte de dicho miembro para extirpar un foco de infección adicional. Ante estas circunstancias no queda duda en nuestras conciencias de que fue la negligencia en el tratamiento de la fractura del menor y en su cuido posterior la causa próxima que con mayor probabilidad ocasionó la pérdida del brazo. Véase *Méndez Purcell* v. *A.F.F.*, 110 D.P.R. 130, 134 (1980).

## VI

Finalmente, el tribunal de instancia concluyó que no hubo negligencia de parte de los médicos del Centro de Diagnóstico que intervinieron con el menor. Es correcta esa

determinación. La prueba refleja que en todo momento dichos galenos refirieron al menor a la atención y cuidado del Centro Médico, a tono con las distintas apreciaciones que consecutiva y diariamente el niño manifestó. Para aquella época no había ortopeda disponible y las facilidades del Centro de Diagnóstico eran limitadas. El cuadro clínico que mostraba Wilmer Iván era serio y delicado. Estando accesible el Centro Médico y los facultativos especialistas que habían intervenido, en las circunstancias particulares[19] de autos, no podemos atribuirles negligencia.

Por los fundamentos expuestos, *se dictará sentencia en que se modifique la del Tribunal Superior, Sala de San Juan, fechada 19 de junio de 1981, a los fines de imponer responsabilidad solidaria por negligencia al Municipio de San Juan, su aseguradora Maryland Casualty Co., los doctores Carlos Grovas, José Abreu Álvarez y Juan Rodríguez Colón, y sus respectivas aseguradoras.*[20] *Se devolverán los autos originales para trámites ulteriores respecto a la cuantía de daños. Se confirmará en los demás extremos.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Díaz Cruz no intervinieron. El Juez Asociado Señor Rebollo López se inhibió.

---

[19] La prueba refleja que el Centro de Diagnóstico no contaba con el equipo necesario para proceder a abrir el yeso. En el juicio se planteó la posibilidad de que se utilizara agua caliente para ablandarlo y así removerlo. Con buen juicio —ante la naturaleza de la operación quirúrgica y la lesión— los doctores de dicho Centro optaron por el referimiento.

[20] La responsabilidad de los demandados es *in solidum*. No se nos ha puesto en condiciones de determinar qué parte de los daños corresponde a la actuación individual de cada facultativo. Esto no prejuzga cualquier acción de nivelación que los demandados pudieran tener entre sí para llevar a cabo este ajuste. Aclaramos también que el municipio responde como principal del Dr. José Abreu Álvarez.