# 97 DTA 155

RECEIVED

NOV 1 2 1997

SERIALS DEPARTMENT
HARVARD LAW SCHOOL LIBRARY

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL DE SAN JUAN**
**PANEL IV**

MARIA M. CACERES, ET ALS.
Apelantes

v.

DR. EFRAIN RAMIREZ, ET ALS.
Apelados

Núm. KLAN-95-00410

San Juan, Puerto Rico, a 30 de junio de 1997

Panel integrado por su Presidenta, la Juez Alfonso de Cumpiano
y los Jueces Broco Oliveras y Miranda De Hostos

Broco Oliveras, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

En el presente recurso se solicita la revocación de la Sentencia Parcial del Tribunal de Primera Instancia, Sala Superior de San Juan, dictada el 17 de febrero de 1995, con fecha de archivo en autos de su notificación del 22 de febrero de 1995. En la referida sentencia se desestimó una demanda de impericia médica presentada en contra de los doctores Efraín Ramírez y Luis Rojas.

Se cuestiona en este recurso la determinación del tribunal de instancia de que no medió impericia médica de parte de dichos demandados y el fundamento aducido por el tribunal al denegar la moción sobre determinaciones de hechos adicionales.

Por entender que la sentencia parcial se ajusta a derecho, procedemos a confirmarla.

### I

La Sra. María Mercedes Cáceres, su esposo Luis A. López y la sociedad de gananciales compuesta por ambos, los apelantes, instaron una reclamación alegando que la señora Cáceres sufrió una hemorragia cerebral como consecuencia de la negligencia, entre otros, de los doctores Efraín Ramírez y Luis Rojas, los apelados. Las alegaciones de los apelantes son las siguientes: que la señora Cáceres empezó para el 29 de julio de 1988 el tratamiento pre-natal con los médicos apelados por encontrarse ésta en la sexta semana de su primer embarazo; que previamente la señora Cáceres había padecido de infecciones periódicas del tracto urinario y tenía historial familiar de hipertensión; que en el historial pre-natal se manifestó un aumento de peso de 28 libras; trazas de albúminas (proteína) y alteraciones en su presión arterial; que en la trigésima octava semana de embarazo le informó al doctor Rojas que en su visión se manifestaron destellos de lucesitas; que el fenómeno de la visión, la albúmina y la subida en presión arterial provocaron que el 3 de marzo de 1989 se ordenara su hospitalización; que la señora Cáceres tuvo alteraciones en la presión arterial sin que los apelados tomaran medidas para estabilizarla; que el 5 de marzo de se le practicó una operación cesárea; que luego de la cesárea los apelados nada hicieron para supervisar de cerca la presión arterial de la señora Cáceres; y que ésta sufrió una hemorragia cerebral que le produjo daños neurológicos permanentes como resultado de la negligencia de los médicos apelados.

Los médicos apelados contestaron la demanda negando tener responsabilidad por dichos daños y alegaron haber actuado de conformidad con las normas generalmente aceptadas por la profesión médica y que no existía relación causal entre sus actuaciones y los daños.

Luego del trámite pertinente y la vista en su fondo el tribunal *a quo* concluyó: que durante el tratamiento pre-natal la señora Cáceres no padeció de alta presión arterial hasta el 3 de marzo de 1989 que manifestó una presión de 130/90 lo que motivó su hospitalización; que durante el tratamiento prenatal y en la hospitalización presentó trazas de albúmina o de proteína no significativas; que durante el embarazo la señora Cáceres aumentó 27 libras y media de peso lo que está dentro de los límites normales; que el 3 de marzo de 1989 alrededor de las 10:00 a.m., el doctor Rojas examinó a la señora Cáceres y notó que el cuello de la matriz estaba cerrado, lo que significaba que no se le podía

inducir un parto natural; que en dicha visita el doctor Rojas encontró la presión arterial en 130/90 y la señora Cáceres le informó haber visto lucesitas dos días antes; que ese día, 3 de marzo, la señora Cáceres fue admitida en el Hospital Presbiteriano; que durante la hospitalización la señora Cáceres estuvo asintomática con presiones arteriales normales o de elevación leve y una reducción a 98,000 de las plaquetas de la sangre; que el 5 de marzo de 1989, un trazado fetal realizado ese día registró, por primera vez, una leve desceleración de los latidos del feto con desplazamiento lateral hacia la izquierda, lo que provocó que se sometiera a la señora Cáceres a una operación cesárea durante la cual se mantuvo asintomática; que una vez terminada la cesárea y durante la recuperación (recovery) se le tomó la presión arterial con la frecuencia requerida sin mostrar hallazgos anormales; que el 5 de marzo de después de la 1:45 p.m. la señora Cáceres fue dada de alta de la Sala de Recuperación y fue llevada a una habitación donde a las 2:20 se registró una presión arterial de 140/100, lo que no es una presión severa; que a las 4:15 la presión arterial subió a 160/110 por primera vez en la hospitalización; que entre las 2:00 p.m. y las 4:15 p.m. la señora Cáceres sufrió una hemorragia cerebral con hematoma y extensión intraventricular; que no hay evidencia de convulsiones, preeclampsia severa o eclampsia, que al ser enterado de esta situación el doctor Ramírez se personó inmediatamente e hizo consultas de anestesia, neurología y neurocirugía y se le administró a la señora Cáceres sulfato de magnesio; que la señora Cáceres desarrolló una hemorragia intracraneal espontánea súbita e inesperada en la región temporal derecha, con una extensión profunda y un rompimiento hacia los ventrículos laterales, tercero y cuarto; que la hemorragia sufrida por la señora Cáceres ro ocurrió en el caudado, el tálamo, el puente cerebral ni el cerebelo, lugar donde normalmente ocurren las hemorragias cerebrales causadas por la hipertensión; que la hemorragia sufrida por la señora Cáceres se debió a una malformación arteriovenosa críptica, ya que dicha paciente no padecía de hipertensión crónica; no presentó evidencia de haber sufrido una aneurisma;sólo contaba con 31 años de edad; no registró presiones diastólicas sobre 120 y sistólicas sobre 220, y no hubo anormalidades en el sistema de coagulación, ni plaquetas por debajo de 30,000, o anormalidad en la función hepática o de la médula ósea ni proteinuria.

A base de las conclusiones antes señaladas, el tribunal de instancia desestimó la demanda en cuanto a los médicos apelados.

Inconforme con dicho dictamen, los apelantes presentaron el presente recurso de apelación y le imputaron al tribunal *a quo* la comisión de los siguientes errores:

*"ERROR PRIMERO: ERRO EL HONORABLE TRIBUNAL DE INSTANCIA AL DESESTIMAR LA DEMANDA DE EPIGRAFE ADUCIENDO QUE LA DEMANDANTE NO PROBO LA NEGLIGENCIA DE LOS DEMANDADOS.*

*ERROR SEGUNDO: ERRO EL HONORABLE TRIBUNAL DE INSTANCIA AL NEGARSE CONSIDERAR LA MOCIÓN SOLICITANDO DETERMINACIONES DE HECHOS ADICIONALES ADUCIENDO COMO ÚNICO FUNDAMENTO PARA TAL NEGATIVA QUE EL MAGISTRADO QUE PRESIDIO LA VISTA EN SU FONDO SE ENCUENTRA EJERCIENDO FUNCIONES COMO JUEZ APELATIVO."*

## II

A diferencia de lo determinado por el tribunal de instancia, los apelantes alegan haber probado que los médicos apelados incurrieron en impericia médica. Se basan los apelantes en el testimonio de su perito, la Dra. Norma Villanueva Díaz. Según la doctora Villanueva, la señora Cáceres desarrolló preeclampsia severa al haberse manifestado hipertensión, proteinuria, edema, irritabilidad neurológica, disturbios visuales (escotoma) y lectura en plaquetas de menos de 100,000; o sea, 98,000 por milímetro cúbico. En opinión de la doctora Villanueva, el tratamiento de la preeclampsia severa conlleva controlar las convulsiones mediante la administración de sulfato de magnesio; el control de la presión arterial y la terminación del embarazo. Las actuaciones constitutivas de impericia médica, de acuerdo con la doctora Villanueva, son el haberse demorado en hacer la cesárea, ■ no haber inducido el parto natural, ■ no haber mantenido control de la presión arterial y no haber administrado medicamentos para evitar las convulsiones. La doctora Villanueva sostiene que la señora Cáceres sufrió convulsiones y que la causa de la hemorragia cerebral lo fue una hipertensión descontrolada. La conclusión de la perito de los apelantes sobre convulsiones se basa en unas notas de enfermería que señala la ocurrencia de movimientos voluntarios e involuntarios de la señora Cáceres.

Los apelantes, además, se apoyan en las guías del *Quality Assessment and Improvement in Obstetrics and Gynecology,* American College of Obstetricians and Gynecologists, pág. 82, march, (1994):

*"Diagnosis:*

*Preeclampsia (Severe) (642.5) or Eclampsia (780.3)*

**Confirmation of Diagnosis:**

*Preeclampsia should not be considered as mild in presence of any of the following:*

*1. Systolic blood pressure equal to or greater than 160 mm Hg or diastolic blood pressure equal to or greater than 110 mm Hg.*

*2. Proteinuria (5 g in 24 hours or greater than 2+ [110 mg/dl] by dipstick).*

*3. Oliguria (24-hour urine of less than 400 ml) or 20 ml/h not responsive to fluid challenge.*

*4. Cerebral or visual disturbances.*

*5. Pulmonary edema or cyanosis.*

*6. Epigastric or right upper quadrant pain.*

*7. Impaired liver function.*

*8. Thrombocytopenia."*

La prueba pericial de los médicos apelados consistió de los testimonios de los doctores Lauren Lynch, Antonio Alvarez Berdecía y Luis Saldaña.

La Dra. Lauren Lynch testificó: que trabaja y enseña en el Hospital Mount Sinai de Nueva York; que tiene una subespecialidad en embarazos de alto riesgo; que presión severa durante el embarazo sería una sistólica de más de 160 y una diastólica de 110 milímetros de mercurio; que durante su hospitalización sus presiones sistólicas variaron entre 110 y 130 y las diastólicas entre 70 y 90 que se consideran normales o levemente elevadas; que durante la anestesia la presión sistólica más alta fue de 150 y la diastólica más alta fue de 90; que mientras estuvo en la Sala de Recuperación la presión sistólica varió entre 150 y 160 y las diastólicas eran de 90; que cinco horas después de la cirugía (4:15) su presión subió a 160 sobre 110; que aunque la hipertensión puede causar hemorragias intracerebrales, para causarlas se requieren presiones mucho más altas que la que tuvo la señora Cáceres; que no hubo ninguna indicación de tratar las presiones hasta el momento en que ya la hemorragia se había producido; que las presiones eran levemente elevadas y no había necesidad de administrar antihipertensivos, ni aun con una presión de 160/95; que no se administra antihipertensivo antes de que surja la necesidad; que las presiones fueron verificadas apropiadamente; que preeclampsia es hipertensión durante el embarazo y en adición tiene que haber una de dos cosas, es decir, edema, hinchazón por acumulación de agua en el tejido subcutáneo) o proteinuria (eliminación en la orina de cantidades sustanciales de proteína); que sólo había trazado de proteína en la orina, que se considera negativo; que eran normales las pruebas de hematocrito, electrólitos y de las funciones del hígado; que el aumento de peso durante el embarazo fue normal; que el contaje de plaquetas fue de 112,000 por milímetro cúbico; que nunca hubo evidencia de convulsiones las cuales conllevan movimientos bastante obvios de las cuatro extremidades y pierden conciencia; que el sulfato de magnesio no previene las hemorragias intracerebrales por lo que su utilización no hubiese alterado el resultado del caso; y que la señora Cáceres pudo haber tenido una condición cerebrovascular que la predispuso a tener hemorragias intracraneales.

El Dr. Antonio Alvarez Berdecía testificó: que es neurocirujano; que la señora Cáceres sufrió una hemorragia grande en la región subcortical temporal derecha con extensión medial hacia los

ventrículos; que no había historial de convulsiónes; que la hipertensión de la señora Cáceres fue de leve a moderada y la única presión significativa fue la de 160/110 que ocurrió a las 4:15 p.m.; que la hipertensión causa sangría intracraneal en pacientes hipertensos crónicos que no es el caso de la señora Cáceres; que la hipertensión leve a moderada no tiene relación con la hemorragia intracraneal; que en el récord médico se documenta que los reflejos estaban normales; que no hubo irritación del sistema nervioso y la única vez que aumentan dichos reflejos es después de la hemorragia; que la escotoma no es producida por edema cerebral, sino que se deben a isquemia (disminución en circulación de sangre) y vasocontricción de las arterias de la retina; que no hay irritabilidad porque no hubo persistencia en la escotoma; que no hay prueba de edema cerebral; que la señora Cáceres no convulsó; que el sulfato de magnesio no evita las convulsiones; que la señora Cáceres nunca tuvo eclampsia; que no hubo proteinuria; que si las hemorragias ocurren exclusivamente en los ganglios basales, las mismas se correlacionan con las hemorragias hipertensivas; que las hemorragias causadas por la hipertensión ocurren usualmente en el caudado y el tálamo; que la hemorragia ocurrió durante una presión más baja de 160/110, ya que esta última presión es la reacción del cuerpo para aumentar el bombeo de sangre al cerebro para mantenerlo vivo; que para que una baja en las plaquetas produzca sangramiento éstas tienen que estar por debajo de 30,000 por milímetro cúbico; que la señora Cáceres tuvo una hemorragia de tipo lobar, no en los ganglios; que las dos causas más comunes de hemorragias en los jóvenes son aneurismas y malformaciones arteriovenosas, pero que la señora Cáceres no tuvo aneurisma; que concluye que la hemorragia se debió a una malformación arteriovenosa críptica; y que llega a esa conclusión cuando evalúa los factores de edad de la paciente, localización del hematoma y ausencia de otros factores que pueden explicarla.

El testimonio del Dr. Luis Saldaña puede resumirse como sigue: que es obstetra, ginecólogo y perinatólogo; que el tratamiento en el hospital fue adecuado por los médicos; que se prestó atención a todos los síntomas que podía expresar la paciente; que no se leyó ninguna presión diastólica más alta de 110 que es lo que define la preeclampsia severa, que no ocurrió proteinuria, la cual requería milígramos por 24 horas y la señora Cáceres tenía 70mm en igual período; que el aumento de peso fue normal; que por un sólo episodio de escotomata no se puede concluir que hubo irritabilidad nerviosa del sistema central; que no se probó que existiera edema cerebral; que el día de la operación el contaje de plaquetas era de 109,000 por milímetro cúbico; que las presiones fueron tomadas con la frecuencia requerida; que luego de la hemorragia las plaquetas estaban en,120,000 por lo que no hay conexión entre plaquetas bajas y la hemorragia; que la paciente no convulsó, no estuvo comatosa, inconsciente y responde a estímulos dolorosos; que no había indicación para hacer la cesárea el 3 de marzo; que de habérsele hecho la cesárea antes no hubiese necesariamente evitado la hemorragia, ya que el efecto del parto para la hipertensión del embarazo no ocurre enseguida que se hace; que no estaba indicado el uso de un agente hipotensor, pues baja la circulación uterina al bebé; que la hidralazina puede empeorar la condición maternal por fallo cardíaco y pobre circulación uterina; que no había indicación para hacer la cesárea el 3 de marzo; que no había preeclampsia severa; que la escotoma es un síntoma subjetivo de la paciente que puede suceder de cualquier cosa; que la escotoma puede ser precursor de eclampsia si se mantiene, pero no de edema cerebral; y que la cesárea no se hizo por angustia fetal, sino porque hubo una reducción en la movilidad del bebé.

## III
Conforme a la norma mínima de atención médica vigente en nuestra jurisdicción, se espera que el médico ofrezca a su paciente aquella atención médica, cuidado, destrezas y protección que, a la luz de los modernos medios de comunicación y enseñanza y conforme al estado de conocimiento de las ciencias médicas, satisface las exigencias generalmente reconocidas por la propia profesión médica. *Rodríguez Crespo v. García Vicario.* Opinión y sentencia de 20 de diciembre de 1993, **93 J.T.S. 167;** *Ríos Ruiz v. Mark,* 119 D.P.R. 816 (1987); *Medina Santiago v. Vélez,* 120 D.P.R. 380 (1984); *Oliveras v. Abreu,* 101 D.P.R. 209 (1973).

En los casos sobre impericia médica, la parte demandante está obligada a establecer, mediante preponderancia de prueba, que el tratamiento médico ofrecido por el demandado, o la ausencia de proveer el tratamiento indicado y correcto, fue el factor que con mayor probabilidad ocasionó el daño sufrido por la demandante. *Rodríguez Crespo v. Dr. Hernández,* 121 D.P.R. 639 (1988); *Ríos Ruiz v. Mark, supra; Cruz v. Centro Médico de P.R.,* 113 D.P.R. 719 (1983); *Zambrana v. Hospital Santo Asilo de Damas,* 109 D.P.R. 517 (1980).

Para establecer *prima facie* un caso de daños y perjuicios por negligencia de un médico, el demandante tiene: que establecer las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas; el incumplimiento del demandado con estas normas en el tratamiento del paciente; y que esto fue la causa de la lesión sufrida por el paciente. *Medina Santiago v. Vélez,* 120 D.P.R. 380 (1988); *Rodríguez Retamar v. Maldonado,* 100 D.P.R. 662 (1972).

En todo caso de impericia médica, se presume que el médico ejercitó un cuidado razonable en el desempeño de sus funciones. *Rivera v. Dunscombe,* 73 D.P.R. 819 (1952); *Ramos Orengo v. La Capital,* 88 D.P.R. 3 (1963).

La presencia de daños no es suficiente, en ausencia de otros elementos, para establecer negligencia. El fracaso de un tratamiento por sí solo no constituye una actuación negligente. Corresponde al demandante establecer mediante prueba pericial todos los elementos probatorios necesarios para probar un caso de impericia médica, excepto que la falta de cuidado sea tan evidente como para inferir negligencia. *Quiñones v. Duarte Mendoza,* 112 D.P.R. 223 (1982).

La negligencia resultante de la impericia profesional de un médico tiene que establecerse, como regla general, mediante prueba pericial. *Luz Quiñones v. Duarte Mendoza,* 112 D.P.R. 223 (1982). En vista de que las determinaciones sobre impericia médica del tribunal *a quo* están fundamentadas en la prueba pericial y documental ofrecida, este tribunal está en igual posición para evaluarla y llegar a sus propias conclusiones. *Fernández v. Hospital General San Carlos,* 113 D.P.R. 761 (1983); *Cruz v. Centro Médico de P.R.,* 113 D.P.R. 719 (1983).

La doctora Villanueva indicó en su testimonio que la señora Cáceres ya tenía preeclampsia severa el día 3 de marzo de 1989. ■ Según las guías del American College of Obstetricians and Gynecologists el diagnóstico de preeclampsia severa requiere de una presión sanguínea sistólica igual o mayor de 160mm Hg o una presión diastólica igual o mayor de 110 mm Hg. *Quality Assesment and Improvement and Gynecologists,* The American College of Obstetricians and Gynecologists, pág. 83, (1994). Para que sea significativa la hipertensión inducida por el embarazo se requiere que las elevaciones en la presión arterial se mantengan durante dos ocasiones en períodos de 6 o más horas de diferencia. Cunningham, MacDonald & Gant, *Williams Obstetrics,* 18th ed., Connecticut, Appleton & Lange, pág. 653 (1989). Del récord médico se desprende que durante el tratamiento pre-natal durante la hospitalización la presión sanguínea excedió límites antes señalados. Solamente a varias horas luego de terminar la cesárea fue que por primera vez subió a 160/110 sin que anterior a ese momento existiera un patrón de hipertensión. Entendemos, por lo tanto, que es correcta la apreciación de los peritos de la parte demandada de que la hipertensión que se manifestó era leve o moderada; por consiguiente, no se daba uno de los elementos esenciales para diagnosticar preeclampsia severa.

Para que la proteinuria sea indicativa de preeclampsia severa requiere 500 miligramos en un período de 24 horas (300 miligramos en la preeclampsia leve). *Id.* Según el récord médico, la señora Cáceres tenía 70 miligramos en 24 horas, lo que es claramente insuficiente para ser significativa.

Como disturbio visual indicativo de preeclampsia severa, la doctora Villanueva señala que la paciente vio lucesitas. Este síntoma, en opinión del doctor Saldaña, no es significativo, ya que no volvió a repetirse, siendo esencial que el mismo se volviera a manifestar para sostener un diagnóstico de preeclampsia severa. Se trataba, además, de hallazgo subjetivo que no puede ser apreciado objetivamente por un médico y está sujeto a múltiples interpretaciones por la paciente.

La doctora Villanueva testificó que se manifestó edema cerebral (hinchazón) y señala que las escotomas lo indican. Por el contrario, declara el Dr. Alvarez Berdecía, perito de los apelados, que la génesis de las escotomas no es por edema cerebral, sino que se produce por vasocontricción de las arterias de la retina. Además, indica el Dr. Alvarez Berdecía que no había documentación alguna en el récord médico indicativa de edema cerebral, lo que puede manifestarse en una tomografía computadorizada.

Un contaje de plaquetas de la sangre que se asocia con hemorragias son los inferiores a 30,000/mm. Adams & Biller, *Hemorrhagic Intracranial Vascular Disease,* en Clinical Neurology, Vol. 2, Cap. 16, pág. 36, (A.B. Baker & L.H Baker, eds., 1993).

A diferencia de lo expresado por la doctora Villanueva en el juicio, no estaba presente irritabilidad neurológica significativa. Según el récord médico a las 4:45 p.m. del 3 de marzo de 1989, los reflejos de los tendones estaban normales. El 4 de marzo los reflejos de los tendones se mantenían normales. Es de notar, además, que durante la deposición de la doctora Villanueva ésta expreso que el día 3 de marzo de 1989 no había hiperreflexia. Deposición de la doctora Villanueva, pág. 130.

Como antes hemos expresado, la doctora Villanueva testificó que la señora Cáceres tuvo convulsiones lo que conjuntamente con otros factores completan el cuadro de síntomas de la preeclampsia severa. Se basó dicha perito en unas notas de enfermería en cuanto a movimientos voluntarios e involuntarios de la paciente. Coincidimos con la opinión de los peritos de los médicos apelados en que lo expresado en dicha nota es insuficiente para concluir que hubo convulsiones. ■ De acuerdo a la prueba pericial de los médicos apelados, éstas normalmente van acompañadas de otras manifestaciones, entre las cuales se encuentran la pérdida de conciencia y hablar incoherentemente.

De acuerdo con el testimonio de la doctora Villanueva, los médicos apelados incurrieron en impericia médica al no mantener controlada la presión arterial. En cuanto a este aspecto, consideramos que le asiste la razón a los peritos de los médicos apelados. En primer lugar, creemos que la hipertensión durante todo el período previo a la hemorragia fue leve o moderada. En segundo lugar, no estaba indicado el uso de medicamentos para reducir la presión arterial. Sobre este aspecto dicen los doctores Creasy y Resnik en su obra *Maternal-Fetal Medicine: Principles and Practice*, Philadelphia, W.B. Saunders, Co., pág. 809 (1989), lo siguiente:

*"Antihypertensive agents are not routinely administered to preeclamptic women. There is no evidence that the acute administration of these agents has beneficial fetal effects. The suggestion that lowering blood pressure reduces de risk of seizures has not been tested. Therapy is reserved for women in whom blood pressure is elevated to a degree that might be associated with intracranial bleeding. Treatment is recommended for women with diastolic blood pressure persistently greater than 110 mm Hg. The goal of blood control is not to attain normal blood pressure but merely to reduce blood pressure to a level that will provide a margin of maternal safety (95 to 100 mm Hg) without compromising adequate uterine perfusion. It is important to remember that these patients have elevated blood pressure with reduced plasma volumen and that too aggresive treatment will lower maternal cardiac output and uterine perfusion and may result in iatrogenic fetal distress."*

Señaló, además, la doctora Villanueva que para evitar las convulsiones se debió administrar a la paciente sulfato de magnesio. Sobre este aspecto, la doctora Lynch testificó que el sulfato de magnesio no previene las hemorragias intracerebrales, por lo que su utilización no hubiese alterado el resultado del caso. Sobre este asunto se dice en la obra *Clinical Neurology*, Vol. 4, Cap. 58, pág. 20 (1993), lo siguiente:

*"Magnesium sulfate has long been widely used to control eclamptic convulsions. However, this substance is far from ideal. Respiratory depression and cardiac arrhythmias represent a threat to the mother, and prolonged use will depress the infant's respiration. Though hypermagnesemia produces a neuromuscular blockage and thus prevents tonic-clonic limb movements, magnesium is not directly an anticonvulsant."*

En lo que se refiere a la etiología de la hemorragia intracraneal sufrida por la señora Cáceres, el Dr. Alvarez Berdecía opinó que la paciente sufrió una hemorragia como resultado de una malformación arteriovenosa de tipo congénita que hacía posible que sangrara en cualquier momento de su vida sin que se pudiera prever la misma.

Entendemos que el tribunal de instancia no erró al concluir que la malformación arteriovenosa críptica (oculta) fue la causa probable de la hemorragia sufrida por la señora Cáceres. Las circunstancias personales, la condición de salud general de la señora Cáceres y el cuadro clínico apoyan la conclusión del Dr. Alvarez Berdecía. La señora Cáceres era una persona joven (31 años) y no era hipertensa crónica. El cuadro clínico de la señora Cáceres se componía de los siguientes elementos: la hipertensión manifestada no excedió de 120 en la diastólica; no se detectó la presencia de aneurismas; no había problemas de coagulación; las plaquetas no estuvieron bajo 30,000 por

milímetro cúbico; no había problemas sobre la función renal ni de médula ósea; y la hemorragia se manifestó en la región temporal del cerebro.

La opinión del Dr. Alvarez Berdecía está sostenida por la literatura médica sometida al tribunal. Sobre la etiología de una hemorragia intracerebral dicen Adams & Biller, *Op. cit.*, pág. 1, lo siguiente:

*"Although ICH (intracerebral hemorrhage) and SAH (subarachnoid hemorrhage) are important illnesses in themselves, they are also manifestations of a large number of diseases. The approach to a patient with an intracranial hemorrhage includes a careful search for an etiology. An ICH should not be attributed to hypertension without a thorough evaluation."*

En cuanto a la edad de la paciente como factor que contribuyera a producir la hemorragia intracerebral nos dicen Adams & Biller, *Ob. cit.*, Cap. 16, (Exhibit *"d"*, demandada, pág. 3) que *"[a]ge has an important effect on the incidence of ICH and SAH"*. De acuerdo a losreferidos autores, la edad mediana observada por éstos en personas con hemorragias intracerebrales lo fue la edad de 71 años en estudios realizados en Rochester, Minnesota entre los años 1969 y 1976.

Sobre el factor de riesgo para ese tipo de hemorragia que representa la hipertensión crónica dicen Adams & Biller que *"[f]or many years, chronic hypertension has been identified as the single most important risk factor for spontaneous ICH."* (Enfasis nuestro.) Adams & Biller, *Op. cit.* presencia de hipertensión más que la causa de una hemorragia intracerebral puede ser el resultado de la misma. Sobre esto nos dicen Adams & Biller, *Ob. cit.*, pág. 5, lo siguiente: *"[h]owever, elevated blood pressure can result from the stress of the IHC, as catecholamines are released with intracranial bleeding. Intracranial hypertension from the ICH also can cause arterial hypertension."* En la página 22 dicen Adams & Biller, *Ob. cit.,* lo que sigue: *"[a]rterial hypertension is a common finding after acute intracranial bleeding, but it can be a consequence as well as a cause."* Adams & Biller, *Ob. cit.,* en la página 24, añaden que *"[h]ypertension may be a compensatory reaction or a side-effect, and it should not be the first diagnostic consideration of lobar ICH or SAH."* Sobre el mismo asunto dicen Adams & Biller, *Ob. cit.*, en la página 25, lo siguiente: *"[h]ypertension - induced ICH should not be diagnosed unless a strong history or physical evidence of chronic hypertension... is found."*

En lo que se refiere al lugar en que se produce la hemorragia expresan Adams & Biller lo siguiente: *"[t]he location of the hemorrhage is important." Id,* a la pág. 3. En cuanto a las áreas donde con más frecuencia se producen las hemorragias intracerebrales, por la hipertensión y otras causas se dice en *Youmen's Neurological Surgery*, Cap. 62, pág. 1892, (1990), lo siguiente:

*"Hypertensive" hemorrhages are principally found in the putamen and thalamus (65 per cent), pons (11 per cent), and cerebellum (8 per cent) and less often in the subcortical white matter of the hemispheres (16 per cent). On the other hand, "nonhypertensive" hemorrhages are mainly located in the subcortical white matter (45 per cent) and involve the deep gray nuclei less often (36 per cent)."*

En cuanto a las hemorragias intraventriculares dicen Adams & Biller, *Ob. cit.*, en la página 10, lo siguiente:

*"Primary, spontaneous intraventricular hemorrhage in adults is rare; it is usually secondary to hypertension, aneurysms, or AVM's (Arteriovenous malformations)."*

Sobre las malformaciones vasculares nos dicen Adams & Biller, *Op. cit.*, pág., lo siguiente:

*"Vascular malformations are a leading cause of ICH and are second to vascular aneurysms as a cause of SAH. The prevalence of cerebral vascular malformations is approximately one tenth that of saccular aneurysms. Vascular malformations cause bleeding in all ages but are particularly important in adolescents and young adults."*

Debe sospecharse la presencia de una malformación arteriovenosa cuando la hemorragia ocurre en la región lobar o cuando le ocurre a una persona que no es hipertensa. Adams & Biller, *Op. cit.*, pág. 33. Una hemorragia intracerebral producida por una malformación arteriovenosa corrientemente se produce en la materia blanca lobar del cerebro, con frecuencia cercana al borde de la corteza (cortical

rim). *Id.*

Sobre las malformaciones arteriovasculares crípticas se dice en el artículo *"Cryptic Vascular Malformations of the CNS",* Journal of Neurosurgery, Vol. 32, Núm. 5, pág. 871, mayo, (1993), lo que sigue:

*"Spontaneous" cerebral hemorrhage. The small size of the "cryptic" vascular malformation, together with their relative frequency, makes them a likely cause for some of the spontaneous hemorrhages usually ascribed to hypertension."*

Las malformaciones arteriovasculares crípticas pueden ser la causa de un porcentaje significativo de hemorragias que se atribuyen a la hipertensión. *Id.*, pág. 873.

Una malformación arteriovascular es con mayor probabilidad la causa de una hemorragia intracerebral cuando la misma ocurre en el área cortical. *Youmen's Neurological Surgery,* Cap. 62 (1990), pág. 1898.

A base de lo antes expresado, consideramos que no erró el tribunal de instancia al desestimar la demanda en cuanto a los médicos apelados. Coincidimos con dicho tribunal en que los apelantes no demostraron, mediante preponderancia de prueba, que las actuaciones u omisiones de los médicos apelados fue el factor que con mayor probabilidad ocasionó el daño sufrido por la señora Cáceres. Si la evidencia señala más de una causa probable del daño, no puede imponérsele responsabilidad a los médicos a menos que del conjunto de la prueba surja que la actuación negligente atribuida a éstos es la que con mayores probabilidades lo causó. *Ramos Orengo v. Gobierno de la Capital,* 188 D.P.R. 315 (1963).

## IV

Como segundo señalamiento de error, los apelantes alegan que al declararse sin lugar una Solicitud para que se Consignen Determinaciones de Hechos Adicionales, el tribunal *a quo* expresó lo siguiente: *"este magistrado no vio el caso, el Hon. Juez Negroni es Juez del Apelativo ahora".* Según los apelantes, el fundamento aducido por el tribunal de instancia es erróneo, ya que la juez que emitió la referida resolución no estaba impedida de considerar la solicitud de determinaciones de hechos adicionales. Consideramos que, si bien es cierto que no estaba impedida, es inconsecuente el fundamento que haya utilizado el tribunal en apoyo de su actuación. Aparte del fundamento utilizado, el tribunal decidió la referida moción, denegándola. Debe recordarse que la revisión se da contra la sentencia o resolución y no contra los fundamentos que se exponen en la misma. *Collado v. E.L.A.,* 98 D.P.R. 111, 114 (1969); *Rodríguez v. Serra,* 90 D.P.R. 776, 777 (1964). Además, no se ha demostrado que se haya ocasionado perjuicio a los apelantes por haberse denegado esa moción, ni que se haya menoscabado su derecho a apelar. Este Tribunal ha tenido ocasión de evaluar la prueba testifical y documental, al considerar los errores presentados.

## V

Por los fundamentos antes expresados, se confirma la sentencia.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 97 DTA 155

**1.** En la deposición, la doctora Villanueva testificó que la cesárea estuvo correctamente decidida (Deposición, pág. 119) y que se actuó con rapidez al hacer la cesárea y evitar daño al bebé (Deposición, págs. 160, 161).

**2.** Del récord médico se desprende una nota demostrativa de que el cuello uterino no estaba favorable para un parto natural, al decir *"see cervix long and closed".* (Exhibit 2, pág. 12, 13 y 92).

**3.** En la deposición, la doctora Villanueva expresó que en la fecha de admisión (3 de marzo de 1989) la señora

Cáceres no tenía preeclampsia severa. Deposición de la doctora Villanueva, pág. 130.

**4.** El Dr. Alvarez Berdecía, quien acudió en consulta luego de ocurrida la hemorragia hizo constar en el récord médico lo siguiente: *"without any history of seizure activity"* Exhibit 2; pág. 97.